**Robert JONES, Jr., Plaintiff–Appellant,**

v.

**James E. LEWIS; Gary Ashby; John Higgins; Safety Director of Louisville; William B. Stansbury; James Thornbury; Richard Frey; Mitchell McConnell, Jr.; and Joe Greene, Defendants–Appellees.**

**No. 86–5171.**

United States Court of Appeals,
Sixth Circuit.

Argued Nov. 10, 1987.

Decided May 18, 1989.

Rehearing Denied July 11, 1989.

James D. Lovewell (argued), Lansing, Mich. (Court-appointed), pro bono, for plaintiff-appellant.

George S. Schuhmann (argued), Allen P. Dodd, III, Richard M. Sullivan (argued), Louisville, Ky., for defendants-appellees.

Before KRUPANSKY and RYAN, Circuit Judges, and CONTIE, Senior Circuit Judge.

PER CURIAM.

Robert Jones, Jr. appeals from the district court's summary judgment in favor of named county officials, directed verdict in favor of named city officials, and a jury verdict in favor of named police officers. Jones also appeals the district court's dismissal of his civil rights claim brought pursuant to 42 U.S.C. § 1983. For the following reasons, we affirm the district court's judgment in part, reverse it in part, and remand the case for further proceedings.

## I.

This litigation stems from a sequence of events which began on March 11, 1980, at approximately six o'clock in the morning. At that time, Jones enlisted the aid of a friend, John Gilkey, to drive him to a factory where Jones' estranged wife, Betty Jones, worked. Jones had been drinking earlier that morning, and he carried a revolver to the factory.

Upon his arrival at the factory, Jones entered the women's locker room, apparently in search of his wife. In the locker room, Jones recognized Linda Henderson, a friend of his wife whom he believed had intermeddled in the Jones' marital problems. At that point, Jones drew his revolver and fired it. Jones testified that he shot the weapon into the air in an attempt to frighten Henderson. Henderson testified that when she observed Jones with the revolver, she turned away in order to escape and, as a result, could not be certain where Jones was aiming the gun when he fired the shot. She testified further, however, that Jones pointed the gun in her direction immediately before she turned to flee.

After firing one shot, Jones threw the revolver and the remaining ammunition into a garbage can and started to leave the factory. Jones then seemingly revised his plan because, when Gilkey rejoined him, he instructed Gilkey to recover the weapon from the garbage can and directed that they depart from the factory separately. Jones then left the premises.

The police were summoned to the scene. Two police officers, James Lewis and Gary Ashby, arrived at the factory and briefly questioned Henderson and Mrs. Jones. The two women described the events which had transpired. Mrs. Jones added that Jones recently had discharged a shotgun into the back of her automobile while her children were in the back seat.

When the officers observed Gilkey attempting to leave the scene, they placed him under arrest. At that point, Gilkey informed the officers that Jones was living with Gilkey's aunt, Peggy Coffey. Gilkey directed the officers to Coffey's residence.

Officers Lewis and Ashby arrived at the Coffey residence approximately twenty-five to thirty minutes after Jones had returned to the home. Lewis, who had had several previous contacts with Jones, noticed him peering from a second story window. Both officers approached the residence and knocked on the door. Coffey and a young child answered the knock. Coffey falsely advised the officers at the door that Jones was not present. The officers then entered the house without permission and without obtaining an arrest warrant.[1] The officers proceeded to the bedroom where Lewis had observed Jones at the window, and they arrested him for an attempted homicide.[2] The officers testified that Jones struggled with them when they attempted to arrest him, and that Jones' behavior required them to force his head against a wall in

---

1. Ashby testified that the officers did not draw their guns. In contrast, Coffey testified that the officers' guns were drawn.

2. Jones later was found not guilty of that charge.

order to secure him in handcuffs. Jones testified that the officers repeatedly knocked his head against the wall, kicked him, and threw him down a flight of stairs. Jones also testified that the officers shackled his feet. Lewis and Ashby denied these charges, particularly the allegation that they shackled Jones' feet.

The officers conveyed Jones from the house to their patrol car. Lewis testified that Jones refused to enter the patrol car peaceably and attempted to kick both officers. Lewis testified that he struck Jones while attempting to force him into the vehicle. Eventually, the officers forced Jones into the back seat of the patrol car, next to Gilkey.

The officers testified that as Jones was taken from the patrol car upon arrival at the substation, he again forcefully resisted the officers and attempted to kick them. According to the officers, Jones slipped and fell face down on the concrete parking lot in the melee that followed. Jones testified that the officers beat him, kicked him, and threw him to the ground.

Once inside a holding cell in the substation, Jones asked to be examined by a doctor and to be permitted to consult an attorney. Following normal procedure, the officers summoned an emergency medical technician (EMT), read Jones his *Miranda* rights, and advised him that he would be allowed to contact an attorney once he was transferred to the county jail. The officers did not interrogate Jones at any time.

The EMT responded but did not treat Jones. He testified that he had no recollection of what transpired at the police substation or of any necessity for medical treatment of Jones. The officers testified that Jones kicked and spit at the EMT, prompting him to refuse treatment and depart. Jones denied this and claimed that, at the time, he was cut and bleeding and his jaw was visibly swollen. The officers testified that they did not recall observing any bleeding or swelling of Jones's jaw.

After the officers booked Jones, he was transported to the county jail, arriving there at approximately 8:30 that same morning. At the county facility, a nurse examined Jones, noted some swelling of his jaw, and administered aspirin. Jones was scheduled to be taken to a hospital for x-rays the next morning; however, he was released from custody shortly before his appointment.

Jones was admitted to a hospital subsequent to his release from the county jail. There, he was treated for a mild concussion and a broken jaw, which was wired for approximately six weeks. Jones testified that these injuries caused intense pain and severe headaches.

On December 2, 1980, Jones filed this civil action pursuant to 42 U.S.C. § 1983, alleging the violation of his constitutional rights. Specifically, he alleges that Lewis and Ashby, the officers who arrested Jones, and various supervisory city officials,[3] violated his fourth amendment rights by arresting him in a private residence without obtaining an arrest warrant and by employing excessive force in the process of arresting him and transporting him to jail. Additionally, Jones alleges that the named officers and city officials, as well as various county officials,[4] consciously denied his medical needs in violation of his eighth amendment rights.

The district court granted the county officials' motion for partial summary judgment, holding that, with respect to them, the complaint alleges at most a claim of negligent medical treatment which did not rise to the level of conscious indifference to Jones' medical needs. The remainder of the case proceeded to trial.

At the conclusion of the plaintiff's case, the district court entered a directed verdict in favor of the city officials, holding that Jones failed to allege or to prove that the

---

**3.** The city officials named include the Louisville Safety Director, John Higgins, Mayor of Louisville William Stansbury, and Chairman of the Louisville Civil Service James Thornbury.

**4.** The county officials named include the Director of the Metropolitan Correctional Services Department Richard Frey, Jefferson County Executive Mitchell McConnell, Jr., and Sheriff of Jefferson County Joe Greene.

named city officials took any action which warranted submitting the issue of their liability to the jury. Only the claims against Lewis and Ashby remained to be defended and submitted to the jury.

At the conclusion of defendants' case, the district court refused Jones' request to instruct the jury that the police officers violated his fourth amendment rights by arresting him in the Coffey residence without obtaining an arrest warrant. The court concluded as a matter of law that the officers had probable cause to believe that Jones had committed a felony, and that exigent circumstances justified the officers' arrest of Jones inside the residence without first obtaining a warrant.

After the jury deliberated for several hours, the district court discussed with the parties the advisability of accepting a less than unanimous verdict from the six-member jury. The judge queried each of the parties, including Jones and his counsel, individually. The parties agreed to accept a less than unanimous verdict, and the district court entered a stipulation of accord. Subsequently, the jury returned special verdicts with answers to interrogatories in favor of the officers.[5]

The district court entered final judgment in accordance with its orders and with the jury verdict. Jones filed a timely notice of appeal from the judgment.

## II.

### A.

■ Jones argues on appeal that the district court erred in granting summary judgment to the county officials and in dismissing the cause of action against them charging conscious indifference to his medical needs. The county officials' motion for summary judgment was supported with uncontroverted affidavits demonstrating that appellant would have been able to prove at most only negligent treatment of appellant's medical condition, which is insufficient to state a cause of action under 42

U.S.C. § 1983. *See Estelle v. Gamble*, 429 U.S. 97, 106 n. 14, 97 S.Ct. 285, 292 n. 14, 50 L.Ed.2d 251 (1976); *Roberts v. City of Troy*, 773 F.2d 720, 724 (6th Cir.1985); *Byrd v. Wilson*, 701 F.2d 592, 595 n. 2 (6th Cir.1983) (per curiam). We conclude that appellant's factually unsupported allegations of conscious indifference to his medical needs were insufficient to withstand a motion for summary judgment. *See* Fed.R. Civ.P. 56(e). *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 324–26, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986); *Potters Medical Center v. City Hosp. Ass'n*, 800 F.2d 568, 572 (6th Cir.1986). Accordingly, the district court properly dismissed the claim against the county officials.

### B.

■ Jones next argues that the district court erred in directing a verdict in favor of the city officials. The allegations against the city officials were supported only by the conclusory statement in the complaint to the effect that the City of Louisville had a custom or policy of using unnecessary force when arresting criminal suspects.

It is well established that "[s]upervisory personnel are subject to liability [only] where evidence establishes that they 'authorized [or] approved ... the unconstitutional conduct of the offending officers.'" ... "[L]iability will not be imposed solely upon the basis of respondeat superior. There must be a showing that the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it. At a minimum, a ... plaintiff must show that a supervisory official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate." *Alioto v. City of Shively*, 835 F.2d 1173, 1175 (6th Cir.1987) (citation omitted). In the case at bar, appellant offered no proof at trial that any of the named city officials authorized, approved, or acquiesced in the

---

**5.** In the first interrogatory, the jury unanimously found by a preponderance of the evidence that Ashby had not used more force than was reasonably necessary to arrest Jones. In the second interrogatory, five of the six jurors made the same finding with respect to Lewis.

actions at issue in the instant appeal. Accordingly, the district court properly granted a directed verdict in favor of the city officials.

### C.

■ Appellant next argues that the district court erred in overruling his objection to defense counsel's conduct in peremptorily dismissing all minority members of the jury panel during voir dire examination. Specifically, appellant argues that the Supreme Court's recent opinion in *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), required the district court to conduct a hearing to determine whether appellees' peremptory dismissal of blacks from the jury panel was the result of intentional racial discrimination. Although *Batson* dealt with the exclusion of blacks from the jury panel in the context of a criminal trial, appellant argues that its holding applies equally to civil actions.

We begin our analysis of this issue by noting that final judgment in the instant case was entered on January 21, 1986, almost three months before the Supreme Court decided *Batson* on April 30, 1986. Assuming *arguendo* the correctness of appellant's argument that *Batson* applies to civil actions, we conclude that *Batson* should not be applied retroactively in this context. *Compare Griffith v. Kentucky*, 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987) *with Allen v. Hardy*, 478 U.S. 255, 106 S.Ct. 2878, 92 L.Ed.2d 199 (1986) (per curiam).

In *Carter v. City of Chattanooga*, 850 F.2d 1119, 1122 (6th Cir.1988) (en banc), this court noted that in considering whether to apply a decision in a civil case retroactively we look to the three-pronged analysis of *Chevron Oil Co. v. Huson*, 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971).

> First, the decision to be applied nonretroactively must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied ..., or by deciding an issue of first impression whose resolution was not clearly foreshadowed.... Second, it has been stressed that "we must ... weigh

the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation." ... Finally, we have weighed the inequity imposed by retroactive application, for "[w]here a decision of this Court could produce substantial inequitable results if applied retroactively, there is ample basis in our cases for avoiding the 'injustice or hardship' by a holding of nonretroactivity."

*Carter*, 850 F.2d at 1122 (quoting *Chevron Oil Co.*, 404 U.S. at 106–07, 92 S.Ct. at 355) (elipses in original). *See also Griffith*, 107 S.Ct. at 713 n. 8. The effect of the first prong of the *Chevron* analysis upon this case is self-evident since the Supreme Court has indicated that *Batson* and its progeny constituted a "clear break" from previous case law. *See Griffith*, 107 S.Ct. at 715, n. 12; *Allen*, 106 S.Ct. at 2880.

The result of the second prong of the *Chevron* analysis is also influenced by *Allen*, a federal habeas corpus case in which the Supreme Court decided not to apply *Batson* retroactively to collateral attacks on criminal convictions. In *Allen*, the Court initially concluded that the purposes underlying the decision in *Batson* were "[to] ensure[ ] that States do not discriminate against citizens who are summoned to sit in judgment against a member of their own race and [to] strengthen[ ] public confidence in the administration of justice," and incidentally to "have some impact on truth-finding [functions of the jury]." *Allen*, 106 S.Ct. at 2880. The Court explained that although "[r]etroactive effect 'is appropriate where a new constitutional principle is designed to enhance the accuracy of ... trials,'" the new rule announced in *Batson* did not have "such a fundamental impact on the integrity of factfinding as to compel retroactive application." *Allen*, 106 S.Ct. at 2880–81.

*Allen* likewise dictates the application to this case of the third prong of the *Chevron* analysis. In *Allen*, the Court elaborated that retroactive application of the ruling in *Batson* would require an attorney, whose

actions in peremptorily dismissing particular jurors had been placed into question, to recall and "explain his reasons for the [questioned peremptory] challenges, a task that would be impossible in virtually every case since the [attorney], relying on [the previous decision of the Supreme Court], would have had no reason to think such an explanation would someday be necessary." *Allen*, 106 S.Ct. at 2281.

In balancing the facts that the decision in *Batson* constituted a clear break from existing precedent, that retroactive application would not further the purposes of the decision, and that retroactive application could produce inequitable results, we hold that *Batson* should not be retroactively applied in civil actions.

### D.

Finally, appellant argues that the district court erred in refusing to instruct the jury on the issue of the officers' justification for entering Coffey's residence without first obtaining an arrest warrant. Although a police officer normally is prohibited from entering a residence to effectuate a warrantless arrest, *see Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed. 2d 639 (1980), an officer is justified in so acting if there are exigent circumstances presented by the facts of the individual case. *See, e.g., Welsh v. Wisconsin*, 466 U.S. 740, 749–50, 104 S.Ct. 2091, 2097–98, 80 L.Ed.2d 732 (1984); *United States v. Korman*, 614 F.2d 541, 546 (6th Cir.), *cert. denied*, 446 U.S. 952 (1980).

We have traditionally found exigent circumstances in the following three instances: (1) when the officers were in hot pursuit of a fleeing suspect; (2) when the suspect represented an immediate threat to the arresting officers or the public; and (3) when immediate police action was necessary to prevent the destruction of vital evidence or thwart the escape of known criminals. *United States v. Morgan*, 743 F.2d 1158, 1162–63 (6th Cir.1984), *cert. denied*, 471 U.S. 1061, 105 S.Ct. 2126, 85 L.Ed.2d 490 (1985). When plaintiff's counsel, at the close of all the proofs, requested that the jury be instructed concerning the legality of the warrantless entry into the home where Jones was arrested, the trial court refused, declaring:

Alright. I am not going to instruct on the constitutional issues that you have raised because, number one the officers, I believe, had reasonable cause to believe that a felony had been committed and, number two, exigent circumstances justified the entry into the house without a warrant. . . .

Although, in a motion to suppress evidence in a criminal case, the factual determination whether exigent circumstances existed to excuse a warrantless arrest is a question for the court, *id.* at 1161, when the issue arises in a civil damage suit it is properly submitted to the jury providing, given the evidence on the matter, there is room for a difference of opinion. *See, e.g., Llaguno v. Mingey*, 763 F.2d 1560, 1565 (7th Cir.1985) (en banc); *Hindman v. City of Paris, Texas*, 746 F.2d 1063, 1067–68 (5th Cir.1984); *Giordano v. Lee*, 434 F.2d 1227, 1230 (8th Cir.1970), *cert. denied*, 403 U.S. 931, 91 S.Ct. 2250, 29 L.Ed.2d 709 (1971).

Here, there is very considerable room for disagreement whether the police officers, when they arrived at the residence where Jones was found, were faced with exigent circumstances excusing their duty to obtain an arrest warrant. The trial court, in holding, as a matter of law, that "exigent circumstances justified the entry into the house without a warrant," did not specify what circumstances it found to be exigent: hot pursuit, threat to the safety of the officers or persons in the home, or the danger that Jones would escape. Consequently, we are left to speculate as to which of the traditional exigent circumstances ordinarily cited as excusing a warrantless arrest the district court had in mind. Arguably, the officers were never in "pursuit" of Jones in the usual sense. They were summoned to the factory after Jones left; they interviewed several witnesses, picked up Gilkey and questioned him, and, on Gilkey's advice that Jones lived with Gilkey's sister, proceeded to the sister's home, arriving there some twenty-five to thirty minutes after Jones arrived at

the residence. But even if all reasonable factfinders would agree that the officers were in pursuit of Jones, not all would agree that they were in "hot" pursuit.

As to the unlikely possibility that the trial court had in mind some danger to occupants of the home in which Jones was apparently living, as an exigent circumstance, it appears that the officers had possession of the gun used in the shooting and had no reason to believe that anyone in the home was in danger of being injured by Jones. Indeed, the evidence is that the woman who answered the door when the police arrived "did not express any fear or danger from her tenant Mr. Jones."

Finally, since the police had the gun used in the shooting, they could not have been concerned with the possibility that vital evidence could be destroyed, and the officers did not claim to have that concern. The testimony of the officers is that they saw Jones peering from the second story window. Arguably, they had him cornered and need only have secured the premises, perhaps with the help of back-up officers, while seeking an arrest warrant. But whether a reasonable police officer, confronted with the situation facing the officers in this case, could reasonably have concluded that immediate action to arrest Jones was necessary in order to prevent his escape is not indisputable and, therefore, was a question for the jury.

Since there was room for disagreement whether any of the exigent circumstances existed that are ordinarily held to justify a warrantless arrest, we hold that the jury should have been given the issue to decide under proper instructions. We therefore remand for a new trial.

■ At the new trial, it may be necessary for the court to instruct the jury on an additional question which neither the parties nor the district court addressed. In order to establish standing to vindicate the violation of his fourth amendment rights, a litigant must demonstrate a reasonable expectation of privacy in the house which was entered by police to arrest him without a warrant. "In cases ... where the defendant is arrested in the home of a third party ... [,] the defendant will not [usually] have had a legitimate expectation of privacy in the premises which were searched and therefore will be unable to challenge the search." *United States v. Buckner*, 717 F.2d 297, 299 (6th Cir.1983); *see also United States v. Salvucci*, 448 U.S. 83, 91–92, 100 S.Ct. 2547, 2552–53, 65 L.Ed.2d 619 (1980); *Rakas v. Illinois*, 439 U.S. 128, 133–34, 99 S.Ct. 421, 424–25, 58 L.Ed.2d 387 (1978).[6]

In this case, the record shows that the home in question was owned by Mrs. Coffey, Gilkey's aunt. However, Gilkey's statement to the police officers indicated that plaintiff lived in the house. The Supreme Court has held that although "legitimate presence on the premises is [not] irrelevant to one's expectation of privacy, ... it cannot be deemed controlling." *Rakas*, 439 U.S. at 148, 99 S.Ct. at 433. On the other hand, if plaintiff shows that he regularly lived in the house, stored his personal belongings there, and was the exclusive occupant of the bedroom, he arguably would have a legitimate expectation of privacy. In any event, the defendants have not yet put Jones to the test on this question.

As with the issue of exigent circumstances, the question of standing in this case would be one for the jury. On the evidence taken as a whole the jury would decide whether, in the totality of the circumstances, Jones had a legitimate expectation of

---

**6.** It is important to differentiate between "standing" as it is used in the context of the fourth amendment and "standing" as it applies in the context of Article III. Article III demands that a plaintiff demonstrate " 'a "case or controversy" between himself and the defendant within the meaning of Article III. This is a threshold question in every federal case, determining the power of the court to entertain suit.' " *Haskell v. Washington Township*, 864 F.2d 1266, 1275 (6th Cir.1988) (quoting *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975)). "Standing," as the term is used with respect to Article III, is clearly not implicated here; there can be no question that plaintiff has presented a justiciable claim against the defendants by alleging that he is entitled to damages under § 1983 for the defendants' violation of his constitutional rights. *See United States v. Nechy*, 827 F.2d 1161, 1164–65 (7th Cir.1987).

privacy in the house. Although the court would make such a determination in a criminal case, in the context of a § 1983 suit for damages, we conclude that it is a question for the jury.

### E.

Having considered the briefs of counsel together with the record in its entirety, we find appellant's remaining assignments of error to be without merit.

For all the foregoing reasons, the district court's judgment is AFFIRMED in part and VACATED in part, and this case is REMANDED for a new trial.

KRUPANSKY, Circuit Judge, concurring in part and dissenting in part.

I concur with the panel majority's decision affirming the district court's grant of summary judgment dismissing the appellant's cause of action against the county officials charging conscious indifference to his medical needs and the majority's disposition of appellant's assignment of error anchored in defense counsel's conduct in peremptorily dismissing minority members of the jury panel during voir dire examination. However, because the majority has failed to consider the totality of the facts impacting the officers' entry into the Coffey residence and existing legal precedent concerning the plaintiff's complete failure of proof to support his reasonable expectation of privacy while in the Coffey residence, I must respectfully dissent from the majority's resolution remanding the case to the district court for retrial because it refused to give appellant's requested but unnecessary jury instruction concerning a warrantless entry into the Coffey residence to arrest Jones.

The majority correctly observes that the Fourth Amendment prohibits law enforcement officers from entering a residence, absent a warrant, unless the police officers are faced with exigent circumstances. *See New York v. Quarles*, 467 U.S. 649, 653 n. 3, 104 S.Ct. 2626, 2630 n. 3, 81 L.Ed.2d 550 (1984); *Segura v. United States*, 468 U.S. 796, 811–12, 104 S.Ct. 3380, 3389, 82 L.Ed.

2d 599 (1984); *Welsh v. Wisconsin*, 466 U.S. 740, 749–50, 104 S.Ct. 2091, 2097–98, 80 L.Ed.2d 732 (1984); *Steagald v. United States*, 451 U.S. 204, 221–22, 101 S.Ct. 1642, 1652, 68 L.Ed.2d 38 (1981); *Payton v. New York*, 445 U.S. 573, 590, 100 S.Ct. 1371, 1382, 63 L.Ed.2d 639 (1980); *see also United States v. Sangineto–Miranda*, 859 F.2d 1501, 1511 (6th Cir.1988); *United States v. Morgan*, 743 F.2d 1158, 1161 (6th Cir.1984), *cert. denied*, 471 U.S. 1061, 105 S.Ct. 2126, 85 L.Ed.2d 490 (1985). Exigent circumstances exist when the police officers are engaged in the "hot pursuit" of a criminal suspect; when the officers have reason to expect personal endangerment and a threat to members of the public; or when immediate action demands the protection of vital evidence from destruction or to foreclose the escape of a criminal suspect. *See Morgan*, 743 F.2d at 1162–63.

In the case at bar, the district court did not err in concluding that the evidence developed during the course of the trial was insufficient as a matter of law to warrant a Fourth Amendment violation jury instruction as a result of the officers' entry into the Coffey residence to arrest Jones without obtaining an arrest warrant because, in the first instance, "exigent circumstances justified the entry into the house without warrant." As the majority correctly concludes, in a civil action ordinarily this is an issue of fact which properly should be resolved by a jury. *See, e.g., Yancey v. Carroll County, Ky.*, 876 F.2d 1238, 1244 (6th Cir.1989); *Reardon v. Wroan*, 811 F.2d 1025 (7th Cir.1987); *Llaguno v. Mingey*, 763 F.2d 1560, 1565 (7th Cir.1985) (en banc); *Hindman v. City of Paris, Texas*, 746 F.2d 1063, 1067–68 (5th Cir.1984), *cert. denied sub nom. Easton v. Boulder*, 479 U.S. 816, 107 S.Ct. 71, 93 L.Ed.2d 28 (1986); *McKenzie v. Lamb*, 738 F.2d 1005, 1008 (9th Cir. 1984); *Losch v. Borough of Parkesburg*, 736 F.2d 903, 909 (3rd Cir.1984); *B.C.R. Transp. Co. v. Fontaine*, 727 F.2d 7, 10 (1st Cir.1984); *Nix v. Sweeney*, 573 F.2d 998, 1001–01 (8th Cir.1978), *cert. denied*, 444 U.S. 929, 100 S.Ct. 271, 62 L.Ed.2d 186 (1979); *Giordano v. Lee*, 434 F.2d 1227,

1230 (8th Cir.1970), *cert. denied*, 403 U.S. 931, 91 S.Ct. 2250, 29 L.Ed.2d 709 (1971); *cf. Arrington v. McDonald*, 808 F.2d 466, 468 (6th Cir.1986) (inference). It is equally clear, however, that in a case where the underlying facts are essentially undisputed, and where a finder of fact could reach but one conclusion as to the existence of exigent circumstances justifying the officers' entry into a dwelling to effect a warrantless arrest, the issue may be decided by the trial court as a matter of law. *See Reardon*, 811 F.2d at 1029–30; *Gramenos v. Jewel Co.*, 797 F.2d 432, 436, 438 (7th Cir. 1986), *cert. denied*, 481 U.S. 1028, 107 S.Ct. 1952, 95 L.Ed.2d 525 (1987); *Williams v. Kobel*, 789 F.2d 463, 470–72 (7th Cir.1986); *Llaguno*, 763 F.2d at 1565; *Moore v. Marketplace Restaurant, Inc.*, 754 F.2d 1336, 1344–47 (7th Cir.1985); *McKenzie*, 738 F.2d at 1008; *Nix*, 573 F.2d at 1001; *compare Hindman*, 746 F.2d at 1067–68.

In the case at bar, an examination of the record demonstrates that the district court correctly deduced from the uncontradicted facts that, as a matter of law, the police officers justifiably concluded that they were faced with exigent circumstances. The testimony evidenced the fact that officers James Lewis (Lewis) and Gary Ashby (Ashby) were engaged in "hot pursuit" of Jones, from the time they had arrived at the factory, immediately after Jones had shot at Linda Henderson (Henderson) and fled, until he was apprehended inside of the Coffey residence; albeit that the pursuit was intermittently interrupted during the twenty to thirty minutes that elapsed between the Henderson shooting and his arrest to question witnesses as to his activities, his propensity for violence and his probable whereabouts. The officers however never abandoned pressing their continuous effort to seek out and apprehend a dangerous "shooter" who was known to have a shotgun in addition to the revolver that he had discarded during his flight from the scene of his latest shooting. The evidence failed to suggest that officers Lewis and Ashby departed from their pursuit to apprehend a dangerous individual from the time Jones had fled the factory until they arrested him.

> [W]hen the occasion for arrest arises while the police are already out in the field investigating the prior or ongoing conduct which is the basis for the arrest, there should be a far greater reluctance to fault the police for not having an arrest warrant. Here, the presumption should be in favor of a warrantless arrest rather than against it....

*2 W. LaFave, Search and Seizure* § 6.1(c) (1987); *compare United States v. Santana*, 427 U.S. 38, 42–43, 96 S.Ct. 2406, 2409–10, 49 L.Ed.2d 300 (1976); *Warden v. Hayden*, 387 U.S. 294, 298–99, 87 S.Ct. 1642, 1645–46, 18 L.Ed.2d 782 (1967); *United States v. Elkins*, 732 F.2d 1280, 1284–85 (6th Cir.1984); *United States v. Holland*, 511 F.2d 38, 43–46 (6th Cir.), *cert. denied*, 421 U.S. 1001, 95 S.Ct. 2401, 44 L.Ed.2d 669 (1975).

Moreover, the uncontradicted facts reflected that the officers had sufficient cause to believe that Jones was an immediate danger to themselves and the public. They had statements from witnesses at the scene of the factory shooting that Jones had recently also discharged a shotgun blast into the rear of a vehicle occupied by his children and driven by his estranged wife. Upon arriving at the Coffey residence and after having observed Jones peering from a second story window, and having been alerted by reliable sources of appellant's access to a shotgun and possibly other weapons apart from the revolver that he had fired at Henderson, and knowing that he was a dangerous "shooter" who was fleeing from arrest, the officers were reasonably justified in fearing for their own safety and the safety of the public.[1] The circumstances confronting the pursu-

---

1. The majority concludes that, because the police had recovered the pistol which Jones had fired at Henderson while in the factory from a refuse container where Jones had instructed his accomplice, Gilkey, to discard it, the officers had no basis for suspecting that Jones could be armed or dangerous. This conclusion ignores the undisputed testimony that Jones had previously fired a shotgun into an occupied automobile, and that officers Lewis and Ashby had no knowledge of the whereabouts of that weapon.

ing officers satisfied every element of the classical textbook definition of "exigent circumstances."

> The Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others. Speed here was essential, and only a thorough search of the house for persons and weapons could have insured that ... the police had control of all weapons which could be used against them or to effect an escape.

*Hayden,* 387 U.S. at 298–99, 87 S.Ct. at 1646; *compare Mincey v. Arizona,* 437 U.S. 385, 392–93, 98 S.Ct. 2408, 2413, 57 L.Ed.2d 290 (1978) ("The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency.") (quoting *Wayne v. United States,* 318 F.2d 205, 212 (D.C.Cir.1963)); *Elkins,* 732 F.2d at 1285 ("The agents knew that at the time of a recent arrest, [appellant] has possessed a semi-automatic weapon and silencer.... [C]ourts should be cautious 'in limiting the ability of police officers to protect themselves as they carry out missions which routinely incorporate danger.'") (quoting *United States v. Coates,* 495 F.2d 160, 165 (D.C.Cir.1974) (footnote omitted)).

The conceded evidence in the instant case supported but one premise, namely that the officers reasonably concluded from the confronting events of the moment that exigent circumstances existed which justified entry into the Coffey residence to arrest a potentially armed and dangerous "shooter" who was attempting to escape arrest. Accordingly, the trial court was correct in concluding that, as a matter of law, exigent circumstances existed to support the warrantless arrest.

An alternative, but equally significant reason which compels the affirmance of the district court's refusal to charge the jury as to the elements of a warrantless entry into the Coffey residence to arrest Jones was his complete failure to prove any material element of his cause of action predicated upon his reasonable expectation of privacy in the Coffey residence. Jones, in his section 1983 claim, requested the trial court to instruct the jury on the elements of a warrantless entry into the Coffey residence to effect *his arrest* to support *his* Fourth Amendment right to be free from unreasonable searches and seizures. Existing precedent mandates that the burden of proving a *prima facie* case lodged in a violation of the Fourth Amendment's prohibition against unreasonable searches and seizures rests upon the plaintiff. The burden is upon the plaintiff to affirmatively prove by a preponderance of the evidence his reasonable expectation of privacy in the structure which was entered by the police officers to effect his arrest without a warrant. *See, e.g., Gillard v. Schmidt,* 579 F.2d 825, 828 (3rd Cir.1978) (To establish an action under section 1983 based upon violation of Fourth Amendment rights, plaintiff must demonstrate "a reasonable expectation of freedom from governmental intrusion" in the residence.) (quoting *United States v. Speights,* 557 F.2d 362, 363 (3rd Cir.1977)); *accord O'Connor v. Ortega,* 480 U.S. 709, 719, 107 S.Ct. 1492, 1498–99, 94 L.Ed.2d 714 (1987) (plurality opinion); *id.* at 731–32, 107 S.Ct. at 1505 (Scalia, concurring); *see also United States v. Salvucci,* 448 U.S. 83, 91–92, 100 S.Ct. 2547, 2552–53, 65 L.Ed.2d 619 (1980); *Rakas v. Illinois,* 439 U.S. 128, 134, 99 S.Ct. 421, 425, 58 L.Ed.2d 387 (1978); *Katz v. United States,* 389 U.S. 347, 352, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967); *Sangineto–Miranda,* 859 F.2d at 1510; *United States v. Blanco,* 844 F.2d 344, 349 (6th Cir.1988); *United States v. Buckner,* 717 F.2d 297, 299–300 (6th Cir.1983).

"Fourth Amendment rights are implicated only if the conduct of the ... officials at issue in this case infringed 'an expectation of privacy that society is prepared to consider reasonable.'" *O'Connor v. Ortega,* 480 U.S. at 715, 107 S.Ct. at 1497; *accord Sangineto–Miranda,* 859 F.2d at 1510; *Blanco,* 844 F.2d at 349. The Supreme Court has advised that the mere presence on premises, by itself, is insufficient to prove that a plaintiff possessed a legitimate expectation of privacy under the Fourth Amendment. *Rakas,* 439 U.S. at 142–48, 99 S.Ct. at 429–33. A plaintiff

asserting a civil action for violation of Fourth Amendment rights must accordingly introduce affirmative proof that he possessed an interest in and involvement with the residence entered which society was prepared to recognize and protect as reasonable under the circumstances. He must satisfy his burden of proof by producing evidence that he had some "control and supervision of the place searched," *United States v. Pollock,* 726 F.2d 1456, 1465 (9th Cir.1984); *accord Sangineto–Miranda,* 859 F.2d at 1510; *Blanco,* 844 F.2d at 349; *see also United States v. Lyons,* 706 F.2d 321 (D.C.Cir.1983); *United States v. Robinson,* 698 F.2d 448 (D.C.Cir.1983); *State v. Isom,* 196 Mont. 330, 641 P.2d 417 (1982); *State v. Allen,* 188 Mont. 135, 612 P.2d 199 (1980), that he possessed "a key [or that] he ha[d] unencumbered access" to the residence, *United States v. Nabors,* 761 F.2d 465, 469 (8th Cir.), *cert. denied* 474 U.S. 851, 106 S.Ct. 148, 88 L.Ed.2d 123 (1985); *accord Jones v. United States,* 362 U.S. 257, 259, 80 S.Ct. 725, 730, 4 L.Ed.2d 697 (1960); *Sangineto–Miranda,* 859 F.2d at 1510; *Blanco,* 844 F.2d at 349; *Robinson,* 698 F.2d 448; *United States v. Meyer,* 656 F.2d 979 (5th Cir.1981), or alternatively that he "kept personal belongings at the residence." *United States v. Salvador,* 740 F.2d 752, 755 n. 2 (9th Cir.1984), *cert. denied,* 469 U.S. 1196, 105 S.Ct. 978, 83 L.Ed.2d 980 (1985); *see also Jones,* 362 U.S. at 259, 80 S.Ct. at 730; *United States v. Grandstaff,* 813 F.2d 1353 (9th Cir.), *cert. denied sub nom. Brown v. United States,* — U.S. —, 108 S.Ct. 119, 98 L.Ed.2d 78 (1987); *Nabors,* 761 F.2d 465; *Meyer,* 656 F.2d 979; *People v. Rodriguez,* 69 N.Y.2d 159, 513 N.Y.S.2d 75, 505 N.E.2d 586 (1987); *Isom,* 196 Mont. 330, 641 P.2d 417; *People v. Wagner,* 104 Mich.App. 169, 304 N.W.2d 517 (1981).

In the case at bar, apart from the isolated, conjectural hearsay comment of Gilkey that Jones was living with Peggy Coffey, the record failed to disclose *any* objective evidence that he exercised *any* control or dominion over the Coffey domicile, by virtue of possessing an entry key to the residence, unrestricted access to that household, storage of any personal belongings or other indicia of presence in the location. On the contrary, the officers found the appellant, fully clothed, under the covers of a bed situated in the room where they had observed him peering from the window.

Since appellant has not offered facts to establish a 'reasonable expectation of privacy' under these factors, we have no basis for finding one.... Appellant's counsel introduced no evidence on how long [he] had been in the house, whether he was in fact living there, if he had a key, or the nature of his relation to the owner. [O]n the basis of the record before us, we must find that appellant had no expectation of privacy in the ... home....

*Robinson,* 698 F.2d at 454–55; *compare Buckner,* 717 F.2d at 300 (no evidence in the "record to indicate that the [appellant] had a legitimate expectation of privacy") *with O'Connor,* 480 U.S. at 718–19, 107 S.Ct. at 1499 (undisputed evidence demonstrated reasonable expectation of privacy). Accordingly, because of the plaintiff's failure to introduce *any* evidence bearing upon the material elements of his reasonable "expectation of privacy" within the Coffey residence which anchored his section 1983 cause of action asserting a violation of his Fourth Amendment rights, the district court correctly refused to instruct the jury on that issue. *See generally Price Waterhouse v. Hopkins,* — U.S. —, — n. 11, 109 S.Ct. 1775, 1788 n. 11, 104 L.Ed.2d 268 (1989) ("In our adversary system, where a party has the burden of proving a particular assertion and where that party is unable to meet its burden, we assume that the assertion is inaccurate.") (Brenan, J., plurality opinion).

Moreover, the case having been concluded, and a jury verdict having been returned, this appellate review effectively affords the plaintiff a second bite of the apple after having failed as a matter of law to prove a *prima facie* case as to his cause of action asserted pursuant to the Fourth Amendment. I would therefore, for the reasons set forth herein, AFFIRM the judgment of the district court in its entirety.