IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT NASHVILLE

OCTOBER 1998 SESSION

FILED

January 7, 1999

Cecil W. Crowson
Appellate Court Clerk

| | |
|---|---|
| **STATE OF TENNESSEE,** | ) |
| | ) C.C.A. No. 01C01-9708-CR-00365 |
| Appellee, | ) |
| | ) Davidson County |
| V. | ) |
| | ) Honorable Thomas H. Shriver, Judge |
| | ) |
| **RODNEY FORD,** | ) (Aggravated Robbery) |
| | ) |
| Appellant. | ) |

FOR THE APPELLANT:                    FOR THE APPELLEE:

Jay Norman                                         John Knox Walkup
213 Third Ave. N.                             Attorney General & Reporter
Nashville, TN 37201

                                                        Daryl J. Brand
                                                        Assistant Attorney General
                                                        425 Fifth Avenue North
                                                        Nashville, TN 37243-0493

                                                        Victor S. (Torry) Johnson III
                                                        District Attorney General

                                                        Kymberly Haas
                                                        Assistant District Attorney General
                                                        Washington Sq., Suite 500
                                                        222 Second Ave. N.
                                                        Nashville, TN 37201-1649

OPINION FILED: _____

**REMANDED FOR EVIDENTIARY HEARING WITH INSTRUCTIONS**

**PAUL G. SUMMERS,**
Judge

**O P I N I O N**

The defendant was convicted by a jury of three counts of aggravated robbery. He was sentenced as a range I standard offender to three concurrent terms of eight years. In this direct appeal, the defendant contends that the trial court erred in denying his motion to suppress evidence. Upon our review of both the suppression hearing and the trial,[1] we remand this matter for further proceedings consistent with this opinion.

**FACTS**

Although the defendant does not directly challenge the sufficiency of the evidence, a brief recitation of the facts is necessary. On February 8, 1994, Kay Krantz, the co-owner of Kwik Kash Pawn, was working in the shop. Grady Morris and Timothy Guinn entered with handguns. Morris knocked Krantz to the floor behind the counter and repeatedly threatened to kill her. He took cash out of the cash drawer. Krantz did not see a third person but learned from a customer that he had seen three men driving away. She testified that approximately $33,000 worth of jewelry, handguns, and money was stolen during the robbery. Morris was the only person she saw actually take things.

One day in early May 1994, Kim Hill was working with Melonie Rose and Jack Garland in Capitol View Pawn. A car pulled alongside the building, a man got out, and the car left. The man entered the store and asked to see some car speakers. His beeper then went off; he left, and immediately thereafter Guinn, Morris, and a man named Lawrence Seging came in, all armed with 9 mm. pistols. Guinn put his gun to Hill's head and Morris put his gun to Garland's head. Seging went to the jewelry showcase. Rose then came out of her office and got between Hill and Guinn. Guinn refused to release Hill and demanded money. Rose opened the register and gave him the money. The phone rang, and Guinn turned the gun on Rose. After taking the money, Guinn ordered the two women to get down on the floor, which they did. Guinn threatened to kill

---

[1]Our Supreme Court has recently held that "in evaluating the correctness of a trial court's ruling on a pretrial motion to suppress, appellate courts may consider the proof adduced both at the suppression hearing and at trial." State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998).

them both.  Eventually the men left.  Rose testified that approximately $40,000 worth of jewelry and three to five hundred dollars in cash were taken.  Neither Rose nor Hill could identify the defendant as having been in the store during the robbery, but Hill testified that the man who had come in right before was the same size, color, and build as the defendant and had the same hair.

On June 14, 1994, Detective Ricky Roll of the Metro Police Department obtained an arrest warrant for Grady Morris.  Later that day, Morris was spotted driving an automobile.  Several officers followed him until he stopped at the defendant's residence on Boatner Drive.  Detective Harold Dean Heaney testified that he "[h]ad no idea" whose residence this was at the time.  Although the record does not contain the arrest warrant, Detective Roll testified at the suppression hearing that they had Morris' home address.  Morris also lived on Boatner Drive, "down the street" from the defendant.

The officers watched Morris enter the defendant's residence.  Detectives Heaney and Roll went to the front door and announced themselves.  No one opened the door but they heard someone in the house running.  The defendant exited the back door, at which point he met several officers including Detective Norris Tarkington with his gun drawn.  An officer asked the defendant if Morris was inside and he replied, "Yes."  The defendant further told them that his younger brother might also be inside.  Detectives Roll, Heaney, and Bill Stroud entered the house through the back door and arrested Morris.  Detective Stroud then searched the house for other persons.  During this search, Stroud located some jewelry lying on a bed.  The defendant was taken to the bedroom and, upon being shown the jewelry, stated that it was his bedroom.  Heaney advised the defendant of his rights, and the defendant made incriminating statements.  The defendant was then placed under arrest.

The defendant told the officers that "he was selling the jewelry for Grady Morris" and told them there was more jewelry in the room. Detective Stroud then searched the room and found more jewelry as well as numerous pawn tickets in the defendant's and Morris' names. He also found some business cards and other literature connected to various pawn shops. Stroud found no cash in the defendant's house.

The defendant also told the officers that he knew about the guns and knew where Morris and Guinn had put them. The defendant subsequently accompanied the officers to this location but no guns were found. The police then returned to the defendant's house (with the defendant), and he then accompanied them to Morris' house. The officers obtained consent to search Morris' house and found more jewelry and a large amount of cash. After this search, the officers took the defendant to the Criminal Justice Center.

After arriving there, Heaney readvised the defendant of his rights, and the defendant indicated that he was still willing to talk. Heaney testified that he "asked [the defendant] if he wouldn't mind just to write down the places that he had robbed and, also, to diagram [them] out for me." Thirty to forty-five minutes later, Heaney returned and collected a handwritten document labelled (by the defendant) "Confession" and two hand-drawn maps. Heaney testified that the diagrams were consistent with the lay-outs of the two pawn shops. The defendant's "Confession" set forth the following:

> Quick Cash Pawn. Grady Morris and Timothy Guinn went into Quick Cash Pawn while I waited outside in the car. After about 5 min[utes] passed I thought something had went wrong and I entered. Grady & Timothy were the only ones I observed, but I heard a woman on the floor (I never saw). I told them to hurry up and I took 3 of the cases of jewelry and came out. About 20 seconds after me the two followed and we drove off.

> Capitol View Pawn. I was supposed to go in and just look around; after about 2 min[utes] Tim and Grady came in with the guns along with Larry Segance [sic] (unarmed) and drew down on the workers. Larry

> began to take the jewelry and then I began to help
> him. Next, we left. (I did not know this pawn shop
> was to be robbed on that day.)

This document concludes with the defendant's signature and the date, "6/14."

The officers did not have a search warrant for the defendant's residence. At the suppression hearing, the defendant testified that the officers had not asked his consent to enter the house. This testimony was uncontroverted.

## ANALYSIS

In its order denying the defendant's motion to suppress, the trial court addressed only the propriety of the "protective sweep" conducted by Detective Stroud in searching the house for other persons. The trial court did not address the warrantless entry into the defendant's residence although this issue was raised and briefed by the defendant. Accordingly, our review of this issue is de novo. See, e.g., State v. Dougherty, 930 S.W.2d 85, 86 (Tenn. Crim. App. 1996).

The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." See also Tenn. Const. art. I, § 7. Accordingly, warrantless searches and seizures within a home are presumptively unreasonable. See Payton v. New York, 445 U.S. 573, 586 (1980); State v. Bartram, 925 S.W.2d 227, 229-30 (Tenn. 1996). Absent consent or exigent circumstances, police officers may not seek the subject of an arrest warrant in the home of a third person without first obtaining a search warrant. See Steagald v. United States, 451 U.S. 204, 216 (1981); State v. Patterson, 966 S.W.2d 435, 441-42 (Tenn. Crim. App. 1997). Exigent circumstances may be found in three situations: "(1) when the officers [are] in hot pursuit of a fleeing suspect; (2) when the suspect represent[s] an immediate threat to the arresting officers or the public; and (3) when immediate police action [is] necessary to prevent the destruction of vital evidence or thwart the

escape of known criminals." Jones v. Lewis, 874 F.2d 1125, 1130 (6th Cir. 1989). But, "[t]he mere existence of these circumstances does not necessarily validate a warrantless search. . . . There must be a showing by those asserting the exception [to the requirement of a warrant] that the exigencies of the situation made the search imperative. The burden is on those seeking the exception to show the need." Bartram, 925 S.W.2d at 230. This burden is a "heavy" one. Welsh v. Wisconsin, 466 U.S. 740, 749-50 (1984); State v. Clark, 844 S.W.2d 597, 599 (Tenn. 1992).

The state makes no contention that the officers obtained the defendant's consent prior to entering his house. Rather, it merely references in a footnote to its brief that "Detective Roll's testimony was not clear as to whether or not Ford gave permission for detectives to enter [his] home." The record of the motion to suppress reveals the following exchange between the trial court and Detective Roll:

> The Court: And did he -- do you know if [the defendant] gave any permission to go in and get Morris?
>
> Detective Roll: (No audible response).
>
> The Court: Or, did anybody ask him for permission?
>
> Detective Roll: Well, there again, that conversation had taken place with Sergeant Stromat before I guess --
>
> The Court: Heaney was in the back, too?
>
> Detective Roll: Heaney was around there and so was -- uh -- Detective Tarkington.
>
> . . . .
>
> Detective Roll: But, Detective Stroud and I didn't come to around back until . . . a short period of time . . . there was some interaction between Mr. Ford and the other group back there.
>
> The Court: Okay. So . . . Stromat says Ford says Morris is in the house?
>
> Detective Roll: Right.

> The Court:  And, you and Stroud go in
> to get him.
>
> Detective Roll:  Yes, sir.

We do not agree that this testimony is unclear; it is simply unhelpful.  Moreover, "[c]onsent to enter and search a home will not be lightly inferred, nor found by mere acquiescence to unlawful authority."  Clark, 844 S.W.2d at 599.  None of the involved detectives ever testified that they had gotten the defendant's consent to enter his residence.  Indeed, the only evidence in the record on this issue is to the contrary.

Since there is no proof that the defendant consented to the entry and search of his home, the state argues that the officers' actions were acceptable because "exigent circumstances were present" in that the officers were "in hot pursuit of a dangerous individual."  We disagree.  Although law enforcement officers may enter homes without search warrants when they are in "hot pursuit" of a fleeing suspect,  see United States v. Santana, 427 U.S. 38, 42-43 (1976), there is no proof in the record before us that Morris was "fleeing" anyone or anything.  Not only was there no proof that Morris had just committed a crime,[2] Detective Roll testified that Morris had had a court date on June 14 and that they began surveillance when he was spotted "leaving the courtroom."  Cf. Welsh, 466 U.S. at 740 (holding that "the claim of hot pursuit is unconvincing [where] there was not immediate or continuous pursuit of the petitioner from the scene of a crime.").  Nor was there any proof that Morris knew he was being followed when he entered the defendant's house or that he did so in an attempt to evade the officers following him.  It is the state's burden to demonstrate why the officers did not obtain a search warrant prior to entering the defendant's home, and they can point to no evidence in the record which justifies their decision to ignore this constitutional requirement.[3]  The warrantless entry into the defendant's residence

---

[2]Detective Tarkington testified that the information they had on Morris was that he had been "involved in an armed robbery earlier, several days, or maybe even weeks earlier" (emphasis added).

[3]The state does not argue, and the record does not support, the existence of either of the other two types of exigent circumstances--that the suspect posed an immediate threat, or that he was going to escape or destroy evidence.  See Jones, 874 F.2d at 1130.

and the subsequent search were, therefore, in violation of his constitutional rights.

Where evidence has been obtained directly or derivatively from an illegal search, the exclusionary rule may operate to bar its admissibility. See Wong Sun v. United States, 371 U.S. 471, 484-85 (1963); Clark, 844 S.W.2d at 600. "However, it has long been recognized that evidence obtained by means genuinely independent of the constitutional violation is not subject to the exclusionary rule." Clark, 844 S.W.2d at 600.

In this case, the evidence that the defendant wants suppressed includes the jewelry and related items found in his home and his subsequent oral statements and written confession. We agree that the property found by the police in the defendant's home incident to their arrest of Morris, together with the statements made by the defendant when confronted with these items, should have been suppressed. This evidence was obtained as a direct result of the officers' illegal entry into the defendant's home and their subsequent search thereof.[4]

This is not all of the evidence against the defendant, however. After arresting him in his home, the police eventually took the defendant down to the Criminal Justice Center. He subsequently signed a waiver of rights and provided a written statement in which he admitted to participating in the robberies of Kwik Kash Pawn and Capitol View Pawn. He also provided diagrams of these two establishments.[5] What remains to be determined, then, is whether this evidence is "fruit of the poisonous tree" and must therefore also be suppressed. See Brown v. Illinois, 422 U.S. 590, 602-03 (1975); Wong Sun, 371 U.S. at 484-86;

---

[4]This evidence would include all of the jewelry collected in the defendant's house, the pawn tickets, the photographs made of these items by the police, the property inventory made by the police, and the business cards and other literature connected to various pawn shops.

[5]The defendant also made a video-taped statement. Due to a taping error, however, the videotape is unintelligible and was not played for the jury.

see also State v. Huddleston, 924 S.W.2d 666, 674 (Tenn. 1996). In other words, we must determine whether the defendant's self-labeled "confession" was obtained by exploitation of the illegal entry and search, or whether it resulted from "an intervening independent act of a free will" sufficient to "purge the primary taint of the unlawful invasion." Wong Sun, 371 U.S. at 486.

> The question whether a confession is the product of a free will under Wong Sun must be answered on the facts of each case. No single fact is dispositive. The workings of the human mind are too complex, and the possibilities of misconduct too diverse, to permit protection of the Fourth Amendment to turn on . . . [the] talismanic test [of whether the defendant received Miranda warnings prior to making his confession.]

Brown, 422 U.S. at 603. Thus, in determining whether the taint has been purged, four factors must be considered: (1) whether the accused received Miranda warnings; (2) the period of time between the arrest and the confession; (3) the presence of intervening circumstances;[6] and finally, of particular significance, (4) the purpose and flagrancy of the official misconduct. See Brown, 422 U.S. at 603-04. The prosecution has the burden of proving, by a preponderance of the evidence, the admissibility of the challenged evidence. See Huddleston, 924 S.W.2d at 675.

Unfortunately, the record before us is simply insufficient with respect to the circumstances surrounding the defendant's written confession for this Court to apply these four factors and determine whether it too should have been suppressed. Accordingly, we must remand this matter to the trial court to conduct a further evidentiary hearing for the purpose of determining whether the defendant's confession should have been suppressed pursuant to the exclusionary rule. If the trial court finds that the confession must be suppressed, it may grant a new trial and suppress all of the evidence obtained from the

---

[6]One such intervening circumstance following an illegal arrest is the release of the defendant on bail and his subsequent voluntary return to the police station to make a statement. See Wong Sun, 371 U.S. at 491. Another circumstance may be the defendant's "consultation with an attorney, relative, friend, or priest prior to the time a statement is given." Huddleston, 924 S.W.2d at 675.

defendant's house as well as all of his oral statements,[7] his written confession, and the two diagrams that he drew in conjunction with the confession. See State v. Crabtree, 655 S.W.2d 173, 179 (Tenn. Crim. App. 1983) (where trial court erroneously excluded evidence at the hearing on the motion to suppress, matter remanded for another hearing with instructions to grant a new trial if motion should then be granted). We hold, however, that if the confession is found admissible, then it, together with the testimony of Krantz, Hill, and Rose, is sufficient to uphold all three convictions of aggravated robbery.[8]

The judgment below is vacated and this matter is remanded for further proceedings in accordance with this opinion.[9]

_____
PAUL G. SUMMERS, Judge

CONCUR:

_____
JOSEPH M. TIPTON, Judge

_____
JOE G. RILEY, Judge

_____

[7]This would include any testimony about the video-taped statement he gave at the Criminal Justice Center.

[8]Aggravated robbery is "the intentional or knowing theft of property from the person of another by violence or putting the person in fear" when it is "[a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon." T.C.A. § 39-13-402(a)(1); see also T.C.A. § 39-11-402 ("A person is criminally responsible for an offense committed by the conduct of another if: . . . (2) Acting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense.").

[9]In light of our disposition of this matter, we need not address the "protective sweep" conducted in the defendant's home.