# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### August 21, 2012 Session

## STATE OF TENNESSEE v. DANIELLE WHITE

### Appeal from the Criminal Court for Greene County
### No. 09-CR-304   John F. Dugger, Jr., Judge

### No. E2011-01817-CCA-R3-CD - Filed April 25, 2013

The Defendant, Danielle White, was convicted of two counts of aggravated assault, a Class C felony. *See* T.C.A. § 39-13-102 (2006) (amended 2009, 2010, 2011). She received sentences for each conviction of three years and six months, with four months to be served in jail. The sentences are to be served concurrently. On appeal, she contends that (1) the trial court erred in failing to appoint counsel and in allowing her to represent herself; (2) the trial judge erred in failing to recuse himself, and denying her a fair trial; (3) the grand jury foreman was not selected constitutionally because there was a systematic exclusion based upon gender, race, and ethnicity; (4) the indictment was invalid because no grand jury foreman was appointed; (5) the trial court erred in using a jury selection process that was not in accord with the relevant statute; (6) the trial court erred in denying the motion to suppress; and (7) there was prosecutorial misconduct when the assistant district attorney referred to the Defendant's invoking her right to counsel. We affirm the judgments of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which ALAN E. GLENN and JEFFREY S. BIVINS, JJ., joined.

Scott Justice (at motion for a new trial and on appeal); Carl R. Ogle, Jr. (at sentencing hearing, motion for a new trial, and on appeal), Jefferson City, Tennessee; and Greg Eichelman (advisory counsel at trial), District Public Defender, for the Defendant, Danielle White.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; C. Berkeley Bell, Jr., District Attorney General; and David R. Baker, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The Defendant's crimes relate to her shooting at a utility company's contracted work crew as they sprayed herbicide on the right-of-way on her property. The Defendant represented herself through the trial proceedings, despite the trial court's urging her to seek counsel. The Defendant claimed she could not afford counsel but refused to complete an affidavit of indigency, although the court repeatedly urged her to do so. The court released $10,000 of the Defendant's cash bond for her use in employing counsel, but she was unable to find counsel who agreed with her interpretation of the Constitution and did not retain an attorney. Shortly before the trial, the court appointed the public defender as advisory counsel. After the trial, the Defendant retained counsel, who represented her at the sentencing hearing and the motion for a new trial and who represent her in this appeal.

At the trial, Paul Pridgen testified that his employer, Helena Chemical Company and Vegetation Management, had a contract with Greeneville Light and Power System involving vegetation control on circuits and utility rights-of-way. He said they were in Greene County on July 27, 2009, performing low-volume application. He said that a work crew was trained to identify species of plants that grew into power lines and disrupted the flow of power and that only those plants were treated. He said that before they performed the work, they sent representatives to provide notification to residents of the upcoming herbicide application. He said that the property of residents who objected would not be treated and that the utility company maintained a list of those individuals. He said that Chris Boles, an employee of the utility company, reviewed the list with the work crew every morning before the crew began treatment and that the property of those individuals was not treated. He said that if a property owner objected to treatment when the crew was working, the crew immediately stopped the treatment.

Mr. Pridgen testified that before they attempted to treat the Defendant's property, John White of the Tennessee Department of Agriculture conducted a two-hour field inspection of the operation. Mr. Pridgen said they "came through with flying colors."

Mr. Pridgen testified that the crew arrived at the Defendant's address around 7:10 p.m. and that it was daylight. He said that they had three trucks and that the crew consisted of four men with backpacks and a crew leader. He said David Caldwell, the application manager with Helena Chemical, Mike Boles, an employee of another chemical treatment company, and he were also present. He said that to his knowledge, the Defendant's address was not on the list of property that was not to be treated. He said that neither the Defendant nor her husband ever approached the crew on July 27 and said they did not want the property treated and that the crew should leave. He said that the Defendant's husband approached the crew leader and asked what they were doing, that the crew leader stated they were applying

herbicide, and that the Defendant's husband walked away without saying anything. He said he was standing by the crew leader and heard the conversation. He said the crew progressed through less than three feet of dense vegetation when he saw movement on a ridge about seventy-five yards away and heard a woman's voice say, "You can't spray no herbicide on my d--- property." He looked up and saw the woman with a rifle. He said the woman leveled a gun at them and fired a shot. He heard the sound of rifle fire and of a shot whizzing by their heads. He said the bullet was close and scared him for his own safety and that of the crew. He stated that there was no question they were in imminent danger and that they left the property as quickly as possible. Mr. Caldwell called 9-1-1. He said that they regrouped at the bottom of a hill and that several Sheriff's deputies responded quickly. He drew and explained a diagram of the scene. He identified a rifle as appearing to be the same one he saw that day. He positively identified the Defendant as the woman he saw that day.

Mr. Pridgen testified that he was a commissioned infantry officer in the Marine Corps in 1976, and that from his training, knew the sound of a bullet. He said the Defendant made her statement and fired the rifle almost simultaneously. He said that had the Defendant not fired the rifle, they nevertheless would have left the property when she told them not to treat it. He did not hear the Defendant say anything after firing the shot but said he might not have heard her speak because he was reacting to the gunshot.

Mr. Pridgen testified that the next time he saw the Defendant, she was in the backseat of Deputy Humphrey's patrol car. He said she cursed at him and told him he could "burn in hell." He said he was certified as a commercial license applicator in North Carolina. He identified the chemicals the crew sprayed that day and said they were approved by the Environmental Protection Agency (EPA).

On cross-examination, Mr. Pridgen testified that photographs he was shown depicted dying plants from broadcast spraying, which was different than low-volume application used by his company. He identified a photograph of a utility pole from which they began spraying and said it showed browning of vegetation that was contrary to their application method. He denied that he or the crew was responsible and said they did not have the capability nor did they use the application technique that would cause the browning. He said the application technique evidenced by the photographs would also require more time to apply than they had before the Defendant started shooting. He said the notification was done under the supervision of Tommy Eubanks, Helena Chemical's application manager, and Chris Boles of the utility company. He said he and the others who were working in the field provided notification to anyone they met who had inquiries.

Mr. Pridgen testified that he did not have herbicide certification from the State of Tennessee but that he was licensed in North Carolina. He said Helena Chemical was

operating under the charter and commercial pesticide license of Spraying for Excellence. He said Mike Boles of Spraying for Excellence supervised their work. He said it was not unusual for companies in the vegetation control industry to work across state lines. He said that Helena Chemical's contract with the utility company required notification of residents and that it was Helena Chemical's business practice to provide notification. He said the notification was performed in this case.

Mr. Pridgen testified that although he did not shoot .22 caliber rifles in the Marines, he "grew up shooting a .22." He acknowledged that he did not serve in Vietnam and that his experience with oncoming fire was in military training.

Mr. Pridgen testified that he had the names of the men on the crew but did not remember them. He said they were from Honduras but denied that they were employed illegally. He said Mr. White examined the workers' documents as part of his inspection.

On redirect examination, Mr. Pridgen testified that he visited the scene the evening before his testimony. He saw evidence of "bare ground application," which he said was not what the crew did on July 27, 2009. He saw eradication of vegetation on both sides of the Defendant's driveway and said the crew had not treated both sides of the driveway on July 27.

David Caldwell testified that he lived in South Carolina but had performed contract work for Greeneville Light and Power on July 27, 2009. He said that they were working around the Defendant's address and that as the work crew began applying herbicide to the right-of-way, a man came down the driveway and asked what they were doing. He said that the crew leader answered and that the man walked away without speaking. He said they continued working and saw a woman come to the top of the hill near the house. He said she was about seventy-five yards away. He said she asked what they were doing, and within twenty seconds, she lifted a rifle and fired a shot over their heads. He said that he had been walking toward the Defendant when he saw the gun and that he told the crew they had to leave when she fired. He said that the woman said, "Consider yourself warned," and that he replied, "We are gone." He said he called the police to report the shooting as they drove away. He identified the Defendant as the person who shot at him.

Mr. Caldwell testified that he was involved in the Department of Agriculture inspection earlier that day. He said they had authority from Greeneville Light and Power for the work they were doing. He said the crew members were from Honduras and had work visas but had probably returned to Honduras by the time of the trial. He said Mr. Pridgen was closer to the Defendant than he was when the Defendant fired the rifle. He said that the events occurred around 7:00 or 7:30 p.m. and that nightfall was not until around 9:00 p.m.

He said that they waited for the police near an old rock quarry, that the police told them they could continue working, and that he believed they finished the work along that road that day.

On cross-examination, Mr. Caldwell testified that he did not think the district attorney's office requested the names of the Honduran crew members. He said he saw a dog at the top of the hill but denied seeing goats, sheep, or hogs. He said it was not possible the Defendant's husband did not see him when the Defendant's husband walked down the driveway. He said he never spoke to the Defendant's husband. He said no one attempted to ask permission to spray that day. He remembered testifying at the preliminary hearing that he did not think the bullet was going to hit them but that the Defendant might have continued firing. He agreed he previously said that the shot was a warning shot and that he feared for the lives of his men and himself. He said the Honduran workers understood when he waved his arms and said, "Let's go."

Mr. Caldwell testified that two men employed by Topgun Application notified people in the area to be treated by placing door hangers on houses. He said they would have placed a door hanger on a gate that was closed or placed the door hanger on the mailbox. He said the door hanger would be adhered with tape. He said that they did not confirm every house had been notified and that confirmation was not required but that the utility company gave them the "green light" to begin the work. He was not aware that the contract stated their work was not to begin until August 4. He did not know he killed the Defendant's goats and hogs or hummingbirds on her property. He did not know he polluted a stream on the Defendant's property. When shown a photograph exhibit, he agreed it depicted a utility pole where they sprayed on July 27. He said the photograph showed selective vegetation management and noted the area was so thickly wooded there was no grass.

Mr. Caldwell testified that he was certified by the State of Tennessee and acknowledged his certification probably was issued after the date involved in this case. He said Mr. Pridgen did not have a spraying license. He said they worked under Mike Boles's charter and license. He said Mr. Boles was present on July 27, and he did not know why Mr. Boles was not present for the trial.

On redirect examination, Mr. Caldwell testified that the Defendant pointed the rifle at them and that the shot went over their heads. When shown a photograph exhibit, he said it showed that more herbicide spraying had been done to the area than they did. He said they only sprayed within fifteen feet of a fence and on one side of the driveway and did not spray the area going up a hill. He noted there was no power line on one side of the driveway and said they would not have sprayed an area that did not have a power line.

Officer Johnnie Wade testified that she worked at the Greene County Detention Center on July 27, 2009, when the Defendant was brought there. She said the Defendant was extremely upset and screamed, kicked, and beat the door. She said she warned the Defendant that she would be pepper sprayed if she did not stop, and the Defendant stopped kicking the door. She said the Defendant was uncooperative when she tried to complete the Defendant's booking and did not provide identifying information. She stated that she did not question the Defendant but that the Defendant claimed to have defended herself against illegal immigrants. She said the Defendant stated, "I better shut up." She said that the Defendant posted bond and asked for her gun and that she directed the Defendant to the Sheriff's Department.

On cross-examination, Officer Wade testified that she did not know if anyone else heard the Defendant's statements. She acknowledged she left the Defendant in a holding cell for some time and said she could not book the Defendant while the Defendant was still agitated. She said that the Defendant was brought in at 20:37 and left at 23:35 and that booking would have taken place about forty-five minutes to one hour before the Defendant left. She acknowledged questioning the Defendant about personal identifying information but denied questioning her about the crimes.

Greene County Sheriff's Deputy Jason Taylor testified that on July 27, 2009, he was dispatched to assist Deputy Humphreys for a "shots fired" call. He said he followed Deputy Humphreys up the driveway and encountered the Defendant's husband, who was mowing. He said the Defendant's husband did not show any physical effects of the chemicals. He said that they asked the Defendant's husband to get the Defendant, that the Defendant's husband went inside, that no one came to the door, that they requested again for the Defendant's husband to get the Defendant, and that the Defendant came to the partially opened door to talk to Deputy Humphreys but stayed inside. He said he stood with the Defendant's husband and did not hear all of the conversation. He said Deputy Graham was on the porch with Deputy Humphreys.

Deputy Taylor testified that after Deputy Humphreys arrested the Defendant, Deputy Taylor told the Defendant's husband they needed the rifle as evidence. He told the Defendant's husband they would give him a property receipt. He said one of the other officers asked the Defendant for the rifle's location and that he and Deputy Graham followed the Defendant's husband inside for officer safety in retrieving the weapon. He said the Defendant was in the backseat of a patrol car at this point. He said the Defendant's husband never objected to his presence in the house. He said they went into a bedroom, where the Defendant's husband took a .22 caliber rifle from a closet and gave it to him. He said that he cleared five rounds of ammunition from the gun and that they went outside. He identified an exhibit as the rifle he collected.

On cross-examination, Deputy Taylor testified that he gave the Defendant's husband a property receipt, but when shown the receipt, he said it appeared the Defendant's husband did not sign it. He said Deputy Humphreys spoke to the men who alleged the Defendant shot at them before coming up the driveway. He said Mr. Pridgen and Mr. Caldwell were the only men he saw at the bottom of the driveway. He said he did not look for bullets outside.

Greene County Sheriff's Deputy Ricky Graham testified that he was dispatched to a shots fired call at the Defendant's address on July 27, 2009. He said Deputies Humphreys and Taylor and some utility workers were there when he arrived. He said he and Deputies Humphreys and Taylor approached the house and spoke to the Defendant's husband, who was mowing. He said that he and Deputy Humphreys went to the door to talk to the Defendant but that he did not hear the entire conversation. He heard the Defendant say she would not speak to them without a warrant and saw her try to close the door. He said he was present when the Defendant was arrested. He said he and Deputy Taylor asked the Defendant's husband for permission to take the gun. He said the Defendant's husband stated the gun was in the bedroom and told them to follow him to get it. He said they followed the Defendant's husband to the bedroom, where the Defendant's husband took the gun from a closet and gave it to Deputy Taylor. He said he never handled the gun. He said Deputy Taylor emptied the ammunition from the gun and secured it as evidence. He said the Defendant was in the back of Deputy Humphreys's patrol car when they obtained the weapon. He did not hear anything the Defendant might have said from the backseat of the patrol car but said she refused to state her name when asked. He did not recall if the Defendant made a statement about shooting the rifle.

On cross-examination, Deputy Graham testified that he did not find any bullets at the scene, see a gun being fired, or see a weapon. He said that the Defendant was inside the house when he arrived and that her husband was mowing the yard. He said that the weapon was not tested to see if it had been fired and that the Defendant's hands were not tested for gunshot residue.

Greene County Sheriff's Deputy Chuck Humphreys testified that on July 27, 2009, he responded to a shots fired call at the Defendant's address. He said someone reported having been shot at by one of the residents. When he arrived, Mr. Pridgen and Mr. Caldwell were in the road and told him a woman up the hill at the Defendant's address shot at them. He said he saw some other workers but did not talk to them. He went to the Defendant's address and talked to the Defendant's husband, who was mowing the yard. He told the Defendant's husband he was responding to the report of a shot being fired at a person and asked if there was a woman present. He said the Defendant's husband said, "She's in the house." He asked the Defendant's husband to get the Defendant in order for the police to speak to her. He said the Defendant's husband went inside for a minute or two and returned

without her. He said that the Defendant's husband did not explain why the Defendant had not come outside and that he asked the Defendant's husband to ask her again to talk to them. He said the Defendant's husband went inside and returned. The Defendant opened the door about one and one-half feet and stood inside. He stood on the porch and spoke to her. He said that at this point, he did not know where the gun was.

Deputy Humphreys testified that he asked the Defendant what happened with the men who were spraying herbicides. He said the Defendant began talking about organic farming, chemicals, and other things he did not understand. He said that he asked her to step outside to talk to him, that she was pulling the door closed, that she inquired whether he had a warrant, and that he arrested her as she tried to close the door. He said that in this situation, he did not think he was required to obtain an arrest warrant. He identified a rifle as the one he saw Deputy Taylor take from the Defendant's house on July 27. He said most .22 caliber rifles held twelve to sixteen rounds and were semi-automatic weapons.

Deputy Humphreys testified that while he was transporting the Defendant to the jail, she talked about illegal immigrants and chemicals. He said she stated she was "just shooting at a deer." He said the Defendant told him that he was part of a government conspiracy and that he was a member of the Synagogue of Satan. He said she told him, "[T]he Jews were pulling my strings like they did everybody's."

Deputy Humphreys testified that he did not see any dead animals when he was at the Defendant's house but that he saw some livestock on top of a ridge. He recalled seeing a "hog lot," a small cow, and possibly a dog.

On cross-examination, Deputy Humphreys testified that in addition to Mr. Pridgen and Mr. Caldwell, there were four or five men to whom he did not speak. He said the men were outside the trucks and there might have been more people inside the trucks. He agreed that when he arrived at the Defendant's house, he did not see a weapon or a crime being committed. He said he did not look for bullets. He agreed he did not have search or arrest warrants. He said her husband voluntarily took them to the gun. He said he did not record his conversation with the Defendant in the patrol car. He remembered the Defendant's asking him to file charges against Mr. Pridgen and Mr. Caldwell. He said he advised her to contact the Tennessee Department of Agriculture. He said he complied with her request that he tell the men to stop spraying for the night.

Deputy Humphreys testified that after he arrested the Defendant, she refused to state her name. He said he asked the Defendant's husband for her identification and did not recall telling her husband the Defendant would be held in jail until her identification was produced.

He said he learned the Defendant's name by checking the information that corresponded to her car's license plate.

Deputy Humphreys testified that he did not search the Defendant's home. He said the Defendant cursed and kicked the windows inside his patrol car. He denied that he and other officers surrounded the Defendant's husband. He said there may not have been any danger when he arrived. He noted, however, that two felony offenses had occurred and that two men were in fear for their lives. He acknowledged he did not check the gun to see if it had been fired. He said the Defendant's husband stated the rifle was the only gun they owned. He said that he was not familiar with chemical allergies and that he was not aware the Defendant raised livestock on her farm for food.

Deputy Humphreys testified that he was aware the Defendant called the Sheriff's Department on July 27, 2009. He said he did not know the time she called. He said the dispatchers sometimes gave advice regarding the proper authorities to be contacted about civil matters. He said the Sheriff's Department could not arrest a person for criminal trespass committed outside an officer's presence. He said the property owner would need to contact the District Attorney General's Office.

Deputy Humphreys denied that the Sheriff's Department used quotas for the number of people an officer must arrest per night. He said he gave the Defendant's husband a property receipt shortly after Deputy Taylor took possession of the gun. He said there was not a space for the Defendant's husband to sign the receipt.

The Defendant called John White, a Tennessee Department of Agriculture inspector, who testified that he performed an inspection involving Mr. Pridgen, Mr. Boles, and Mr. Caldwell on July 27, 2009. He said Mr. Boles was on-site with the spraying crew and was a licensed applicator who was legally authorized to supervise others. He said his records showed that Mr. Boles was present from 4:00 until 8:00 p.m. He said that at a later date, Mr. Boles was cited for failing to list the names of his employees with the Department of Agriculture.

He testified that he performed testing that determined the concentrations of Glyphosate and Amazapere on the Defendant's farm. He said he responded to the Defendant's complaint to State authorities regarding pesticide use. He said the Defendant refused to sign a form required by the EPA in order to obtain medical records, affidavits, and other documents.

On cross-examination, he testified that the pesticide application on the Defendant's farm was done in accord with the pesticide label's instructions. He said he inspected the

Defendant's farm on August 6, 2009, with his regional supervisor, Lynn Snyderly. He said he did not see any damage to the Defendant or her family from the chemicals.

David Jackson, a regional manager for Wolf Tree Company, testified that his company was contracted to trim trees away from Greeneville Light and Power's utility lines. He said in non-emergency situations, he normally obtained written permission from property owners. He said, though, that if they could not obtain permission, they usually performed the work anyway.

Chris Boles, Supervisor of Tree Trimming Operations with Greeneville Light and Water Company, testified that under the contract Helena Chemical Company had with his employer, Helena was responsible for notifying customers of upcoming herbicide spraying. He said he received a couple of complaints about Helena's notification of property owners. He said that 2009 was the first year the company did a full-scale herbicide treatment in Bulls Gap. He said herbicide application was to be done during daylight hours. He was aware of a telephone call to the utility company at 7:40 p.m. on July 27, 2009. He said that the dispatcher should have contacted a supervisor that evening and that the dispatcher was told the proper procedure.

On cross-examination, Mr. Boles testified that keeping the rights-of-way maintained was of benefit to the utility company's customers. He said that before July 27, he had not been contacted by the Defendant regarding a "no spray" list. He said a customer might also notify a field worker. He said he kept records regarding the properties not to be sprayed. He said the utility's contracts required application of non-toxic chemicals.

On redirect examination, Mr. Boles testified that he was not aware of spraying done on the Defendant's property in the seven years she owned it. He said Helena began notifying property owners in May 2009. He said the individuals who performed the notifications were no longer employed with Helena.

Sherry Woodby testified that she was an employee of the Greene County Sheriff's Department. She said she was on duty on July 27, 2009, but did not receive a telephone call from the Defendant that night.

Robert White, the Defendant's husband, testified that on July 27, 2009, he and his wife and two children lived on an organic farm. He said they raised goats, sheep, pigs, cows, chickens, and honeybees and grew their own produce. He said their older son's asthma was relieved by an organic diet. He said that on July 27, there were hogs in a pen along the side of the driveway. He said it was possible the work crew did not see them. He said the hogs

-10-

were across the driveway from the area that was sprayed. He identified a photograph of the hogs.

Mr. White testified that he did not recall seeing Mr. Pridgen or Mr. Caldwell at the bottom of the driveway on July 27. He said he focused on some Hispanic men who crossed their fence line and sprayed chemicals. He said the power lines had been on the property as long as he had lived there. He said the men did not spray beyond their property.

Mr. White testified that he saw the men around 7:30 p.m. He said that he was mowing the yard and that the Defendant was inside grooming their sons' angora rabbits. He said the men were spraying the pasture where their livestock grazed. He said that he went down the driveway and tried to communicate with one of the men but that the men did not speak English. He walked up the driveway to let the Defendant know what was happening. He said he was not notified of the spraying or asked for permission. He said he was present when his wife called the Sheriff's Department.

During Mr. White's testimony, a recording of the Defendant's call to the Sheriff's Department on July 27, 2009, was played for the jury. In the call, the Defendant reported that individuals who claimed to be with the utility company were spraying chemicals on her organic farm. She stated that no one asked permission and that the workers had crossed a fence line and were on her property. She said workers had trimmed trees excessively earlier that year. She said she told the workers that she would call the police if they did not leave. The dispatcher told the Defendant she would need to contact a lawyer or the workers' supervisor.

After the recording was played, Mr. White testified that the utility company cleared trees on the power line in 2008. He said his wife called the Sheriff's Department around 7:30 or 8:00 p.m. He said that after the call, he looked for a camera to film the workers. He said the Defendant called the utility company. He said they did not offer any assistance.

Referring to a photograph exhibit, Mr. White testified that the utility pole was inside the fence on their property. He said a photograph depicted the dying vegetation after the spraying. He said that their property was fenced and gated and a no trespassing sign was posted. He said there was a sign designating it was an organic farm and stating that no pesticides were used on the property. The signs were at the base of the driveway.

Mr. White testified that about fifteen or twenty minutes after the workers left, Sheriff's deputies arrived. He said he was mowing the yard and saw four patrol cars on the driveway. He said the Defendant was inside. He said the deputies stated they needed to speak with the Defendant and asked him to get her. He said that she was not comfortable

coming outside and that he informed the deputies. He said that the deputies asked him a second time to get her and that the Defendant came to the door to call him inside. He said he went back to the house. He said that the deputies asked the Defendant to come outside, that she asked if they had a warrant, that the deputies said they did not, and that the Defendant stated she was not comfortable coming outside if they did not have a warrant and she did not have an attorney present. He said that the Defendant started to close the door but that the deputies forced their way inside, handcuffed the Defendant, dragged her outside, and put her in the back of a police car. He said that the deputies asked him for the Defendant's identification but that he was unsure where the Defendant's purse was. He said two deputies followed him inside and asked him again for the Defendant's identification. He said he told them it might be in the bedroom and walked into the bedroom with the deputies. He said one of the deputies spotted the rifle in the closet and confiscated it. He said the deputies left moments later. He said that it was an intimidating situation and that he never gave permission for the officers to search the house. He denied that he handed the gun to the officer. He said he had never seen the Defendant threaten anyone's life.

On cross-examination, Mr. White testified that when he approached the men who were spraying, he attempted to talk to the one closest to him. He said the man did not reply, smiled, then continued spraying. He said that when the trees were trimmed, they received advance notification when someone came to the door, gave them a permission slip they were asked to sign, and specified the date two weeks later when the trimming would occur. He said the Defendant wrote on the permission slip that they were allowed to trim trees but not to spray chemicals. He said the permission slip would be with the tree trimming company. He agreed that a utility pole was inside the fence. He said another pole was outside the fence. He said they did not have a problem with maintenance of the right-of-way if prior written permission was obtained, the maintenance was limited to tree trimming, and no chemicals were used. He said he did not contact the utility company to be placed on the no spray list and was unaware the list existed.

Mr. White testified that the deputies may have said they wanted to retrieve the rifle. He said that after the Defendant called the Sheriff's Department, she went outside while he searched for the camera. He said he never saw her with a gun. He said the rifle was on the floor of the closet and acknowledged it was loaded. He said the rifle had a trigger lock. He said his children were at their grandparents' house at the time. He said that if the children were home, they could see the gun but did not bother it. He said he did not use a gun on July 27. He said that the house was not near the road and that no one threatened to come inside that day.

On redirect examination, Mr. White testified that the farm was just over twenty acres and was surrounded by uninhabited land. He said that it was in the mountains, that it was

wooded, and that hunters were common. He stated that it was common to hear gunshots and that they echoed through the canyon. On recross-examination, he said the fences existed when they bought the property.

The jury found the Defendant guilty of aggravated assault of Mr. Pridgen and Mr. Caldwell. After a sentencing hearing, the trial court sentenced the Defendant to concurrent sentences of three years and six months for each conviction and ordered split confinement of four months' jail time. The Defendant has appealed.

**I**

The Defendant contends that the trial court erred in failing to appoint counsel and in allowing her to represent herself. The State counters that the Defendant failed to demonstrate that she was indigent or that she was denied counsel. We agree with the State.

The record reflects that the Defendant represented herself until the sentencing hearing and the motion for a new trial, at which point she was represented by retained counsel. The Defendant refused to complete an affidavit of indigency before the trial, even after the trial court explained that the affidavit was required before counsel could be appointed. The Defendant told the court she could not afford counsel, and the court released $10,000 of her $20,000 cash bond for her use in employing counsel. The Defendant later reported to the court that she had not retained counsel because she could not find counsel who would represent her for a reasonable fee. When asked if she could not find a lawyer to represent her for $10,000, she stated that she was invoking her Fifth Amendment rights. She also expressed her objection to the constitutionality of the court's requiring her to complete the form. The court repeatedly urged the Defendant to retain counsel or complete the affidavit of indigency, but the Defendant failed to do so.

After the Defendant failed to retain counsel with the $10,000 the trial court released, the court reinstated the Defendant's bond to the original amount. The court advised the Defendant that it was necessary for her to complete the form in order for it to assess her indigency status and determine whether she qualified for appointed counsel. When asked whether she wanted to complete the form, she said she did not. She said that she would represent herself but that her decision was not voluntary because the court instructed her to complete the affidavit if she wanted appointed counsel. The record reflects that at one point before the trial, the Defendant partially completed an affidavit but did not sign it because the numbers she listed were approximate and she did not think some of the information requested was relevant. After numerous occasions when the court encouraged the Defendant to complete the affidavit or hire counsel and explained the gravity of her situation and the process for obtaining appointed counsel, the court appointed the public defender to act as

advisory counsel for the Defendant at the trial. The Defendant still had not completed an affidavit of indigency, and the court assessed a $500 fee for the public defender's services, to be collected from the Defendant's cash bond at the end of the case.

## A. **Failure to Appoint Counsel**

Regarding the Defendant's claim that the trial court erred in failing to appoint counsel, Tennessee Rule of Criminal Procedure 44(a) states that "[e]very indigent defendant is entitled to have assigned counsel in all matters necessary to the defense and at every stage of the proceedings, unless the defendant waives counsel." The record does not reflect that the Defendant is indigent and entitled to appointed counsel. *See* T.C.A. § 40-14-202 (2012) (stating that the trial court shall appoint counsel in a felony case in which the defendant is indigent); Tenn. Sup. Ct. R. 13, § 1(c) (same). The Defendant refused to complete an affidavit of indigency before the trial. She was not entitled to appointed counsel when her actions thwarted the court's attempts to determine her indigency status in order to appoint counsel. *See State v. Rocky Joe Houston*, No. E2011-01855-CCA-R3-CD (Tenn. Crim. App. Feb. 11, 2013) (per curiam) (holding that a defendant who refused to complete an affidavit of indigency did not show that he was indigent and was not entitled to appointed counsel), *perm. app. denied* (Tenn. Aug. 16, 2012), *app. for extraordinary app. denied* (Tenn. Sept. 19, 2012).

## B. **Failure to Conduct an Indigency Hearing**

The Defendant also contends that the trial court failed to conduct a proper hearing on her indigency status. Tennessee Code Annotated section 40-14-202(b) requires, in pertinent part,

> Whenever an accused informs the court that the accused is financially unable to obtain the assistance of counsel, it is the duty of the court to conduct a full and complete hearing as to the financial ability of the accused to obtain the assistance of counsel and thereafter, to make a finding as to the indigency of the accused.

The statute provides that the accused's statements shall be by sworn testimony in court or by sworn affidavit. T.C.A. § 40-14-202(b).

At a hearing shortly after the return of the indictment, the Defendant stated under oath that she could not afford to hire an attorney and that she would like an attorney appointed with whom she could consult. She said,

I don't know that I'm going to be keeping him. I tried to get an attorney, but the problem is that I cannot afford one, and I would like somebody that would be able to spend enough time on my case – not just somebody that's going to have five hundred cases and not practice any . . . type of representation.

She stated that she was a farmer with income of $100 to $300 per month and that she owned a farm, which was mortgaged. She said she did not have funds to retain counsel because she posted a $20,000 cash bond. She said she would be "more than happy" to retain counsel if the trial court would release her bond. She also testified about her income from farming and the ownership of her farm. In response, the court found that the Defendant was not indigent but released half the bail money for the Defendant to hire an attorney. At hearings two and three months later, the Defendant stated she still had not retained counsel. Throughout the proceedings leading up to the trial, the court repeatedly urged her to complete the affidavit and advised that her best interests were served by her having legal representation. She asserted that the State was "an artificially created entity" and that she had a constitutional right to counsel but refused to complete the affidavit. The court explained to her that although she had a right to counsel, she did not have a right to counsel at taxpayers' expense unless she demonstrated her indigency. The court explained to her Tennessee Supreme Court Rule 13 regarding the requirement of an affidavit of indigency before appointment of counsel. The court made exhaustive efforts to obtain a statement under oath from the Defendant regarding her financial status, and she refused to cooperate.

Given the facts of the case, we conclude that the trial court did not err in conducting a detailed indigency hearing. Although the Defendant answered some questions under oath regarding her income and property, she refused to provide additional information in a sworn affidavit despite the court's repeated urgings. She never provided the court with sufficient information about her total household income, assets, and monthly expenses to allow the court to determine whether she was entitled to appointed counsel.

## C. **Allowing the Defendant to Represent Herself**

We must still address whether the trial court erred in allowing the Defendant to represent herself. A criminal defendant has a right to be represented by counsel under both the United States and Tennessee Constitutions. U.S. Const. Amend. VI; Tenn. Const. art. I, § 9. A criminal defendant also has a Sixth Amendment right to proceed pro se. *Faretta v. California*, 422 U.S. 806, 819 (1975); *State v. Northington*, 667 S.W.2d 57, 60 (Tenn. 1984). In order to invoke the right to proceed pro se, a defendant must meet three requirements: 1) the defendant must timely assert the right to self-representation, 2) the request must be clear and unequivocal, and 3) the defendant must knowingly and intelligently waive the right to the assistance of counsel. *State v. Herrod*, 754 S.W.2d 627, 629-30 (Tenn. Crim. App.1988).

The rule requires that before accepting a waiver, the court must advise the defendant of her right to counsel at all stages of the proceedings and determine whether there is a competent and intelligent waiver by questioning the defendant about her background and experience. Tenn. R. Crim. P. 44(b)(1). The rule also requires that a written waiver be executed and that it be made part of the record. *Id.*

The record in this case contains an unsigned waiver of the right to counsel, which the trial court directed be filed as an exhibit at the beginning of the trial. The record does not reflect the events that transpired regarding the unsigned waiver. At the motion for a new trial, defense counsel stated, "[S]he didn't waive her right [to counsel], she didn't sign a waiver, she didn't indicate that she would[.]" The record reflects that before the trial, the court questioned the Defendant about her legal and procedural knowledge, experience representing herself, the charges against her, the potential sentences, the fines if convicted, and her privilege not to testify. Despite the court's extensive efforts to get the Defendant to accept the assistance of counsel, the Defendant was not cooperative with the court, stated that the attorneys she interviewed did not meet her expectations and did not charge a reasonable fee, and indicated her preference to represent herself. It is apparent from the record that she would not sign the written waiver and wished to proceed pro se, rather than complete the affidavit of indigency or retain counsel.

Upon review of the record, we conclude that the Defendant asserted her right to represent herself. Regarding whether her request was clear and unequivocal, the record reflects that the Defendant insisted that the court should appoint counsel, yet she refused to complete an affidavit of indigency, even after the court repeatedly explained to her that her constitutional right to counsel did not extend to appointed counsel for a non-indigent defendant and that she must be found indigent to receive court-appointed counsel. Likewise, she failed to retain counsel when the court released part of her bond in order for her to do so. The record reflects that the court released $10,000 of the Defendant's cash bond, yet three months later, she had not retained counsel. The court repeatedly advised the Defendant of the perils of self-representation, yet the Defendant insisted that she would proceed pro se unless the court appointed counsel despite her failure to complete the affidavit. Eventually, at a hearing several months after releasing half the cash bond, the court appointed the public defender as advisory counsel to assist the Defendant at the trial. We conclude that the Defendant may not subvert the process for receiving court appointed counsel or for proceeding pro se by failing to complete the affidavit of indigency if she desired appointed counsel or failing to sign the waiver of counsel if she desired to proceed pro se. She is not entitled to relief.

## II

The Defendant contends that the trial judge erred not recusing himself and that the failure denied her a fair trial. The State counters that the Defendant has not shown that the trial judge abused his discretion in denying her motion to recuse or in failing to recuse himself after ruling on the motion. We agree with the State.

A trial judge should grant a motion to recuse whenever his or her impartiality can reasonably be questioned. *Alley v. State*, 882 S.W.2d 810, 820 (Tenn. Crim. App. 1994). Recusal is "warranted when a person of ordinary prudence in the judge's position, knowing all of the facts known to the judge would find a reasonable basis for questioning the judge's impartiality." *Id.* The standard of review on appeal is whether the trial court abused its discretion by denying the motion. *Bd. of Prof'l Responsibility v. Slavin*, 145 S.W.3d 538, 546 (Tenn. 2004); *State v. Cash*, 867 S.W.2d 741, 749 (Tenn. Crim. App. 1993). The Code of Judicial Conduct states in pertinent part:

> (1) A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances where:
>
> > (a) the judge has a personal bias or prejudice concerning a party or a party's lawyer, or personal knowledge of disputed evidentiary facts concerning the proceeding[.]

Tenn. S. Ct. R. 10, Canon 3.E.(1)(a).

In the present case, the Defendant moved for the trial judge to recuse himself because the judge's Statement of Disclosure form revealed that he derived income from Coca-Cola Enterprises. The Defendant's motion stated that Coca-Cola used products produced by Monsanto Corporation, the manufacturer of the pesticide Glyphosate. She alleged that the judge could not be impartial in the case because it involved chemicals having been sprayed on an organic farm. She attached a document purporting to be a printout from the Internet stating that one of the judge's sources of income was his wife's salary with Coca-Cola Enterprises. The Defendant later filed an amended motion for recusal stating that the Defendant "questions" whether the judge was a customer of Greeneville Light and Power and alleging that whether or not he was, he would have "feelings of sentiment and possibly sympathy with regard to the parties in this case."

-17-

Before the amended motion was filed, the trial court held a hearing on the original motion. The court stated that his wife previously worked for Coca-Cola as a human resources officer but that she was no longer employed with the company because her position was moved to Florida. The court stated that it had no investments or contacts with Coca-Cola and denied the motion. The record does not reflect that the court ruled on the allegations of the Defendant's subsequent amended motion for recusal regarding the judge's affiliations with or sympathy toward the utility company.

On appeal, the Defendant raises a different ground for recusal. She contends that the trial judge made improper comments demonstrating his prejudice against the Defendant. As the State notes, the Defendant did not make a motion for recusal based upon the judge's allegedly inappropriate comments. While the failure to seek recusal in a timely manner may result in a waiver of a party's right to question a judge's impartiality, a reviewing court may nonetheless address the merits of a recusal issue because of the fundamental right of a criminal defendant to a fair trial. *See Slavin*,145 S.W.3d at 548; *see also In re Cameron*, 51 S.W. 64, 78 (Tenn. 1912); *cf. Davis v. Tenn. Dep't of Emp. Sec.*, 23 S.W.3d 304, 313 (Tenn. Ct. App. 2000).

The record reflects that the Defendant often interrupted and argued with the trial judge and that the judge attempted to maintain courtroom decorum by cautioning and, at times, admonishing the Defendant for her improper conduct. The Defendant complains of several specific instances, which we will detail.

At a hearing on the motion to recuse on November 30, 2009, the Defendant repeatedly interrupted the judge. Eventually, the judge admonished her not to argue with him. He said at first that he would jail her but then stated he was not going to jail her. He told her that she could argue her motion but that she should not question him or talk after he began his ruling. The court heard the Defendant's argument and denied the motion. Later at this same court appearance, the court ruled that it would release half the Defendant's cash bond in order for her to retain counsel and scheduled a hearing for March 31, 2010, for the Defendant to be present with her attorney.

For reasons not explained in the record, the trial court held a hearing sooner, on January 4, 2010. Although the Defendant does not complain of the court's actions on January 4, 2010, the hearing is relevant to show the context of her complaints. The Defendant said she was in court to have her motions heard, but the judge stated that he thought the Defendant was present to announce her attorney. The Defendant stated that she talked to several attorneys who refused to take the case. She claimed the attorneys "don't really believe in the Constitution" and said she could not hire an attorney who did not think she would prevail. The Defendant continuously interrupted the judge. The court noted that

the Defendant had funds to hire an attorney and said she needed to do so. The Defendant responded that her current economic concern was feeding and housing her children. She said her husband's income varied monthly and claimed she had a negative net worth. The court continued to encourage the Defendant to retain counsel, and she said she was unwilling to have someone handle her case who was "going to be falling asleep in the courtroom and not paying attention" or would not devote proper time to the case. The court reset the case for the Defendant to appear with counsel.

At the next court date, March 31, 2010, the Defendant appeared without counsel. The Defendant said she was not going to complete an affidavit of indigency because she had been told it was unconstitutional. She argued that she was entitled to appointed counsel without regard to her indigency status. She said she attempted to hire an attorney but had not done so because she could not find an attorney for a "reasonable cost." When asked whether she was able to find an attorney who would represent her for the $10,000 the court released from her cash bond, she stated that she was "pleading the 5th Amendment." The court reinstated as bond the $10,000 it had given her to hire counsel. The court explained, "[Y]ou're conning the Court. You said you were going to hire a lawyer with the $10,000 I gave you back, and you didn't do it. So you're going to have to . . . get back on your $10,000 bond."

At a hearing on May 7, 2010, the trial court asked the Defendant if she had retained counsel. She again stated that she had not and that she had intended to inform the court at her previous hearing that she would represent herself but that the court had jailed her before she could do so. The court reiterated that it reinstated her bond because she requested $10,000 be returned in order to hire an attorney but did not hire anyone. The Defendant continued to insist that she had a right to a court-appointed attorney and acknowledged she had not completed the affidavit of indigency. The court continued to urge the Defendant to complete the affidavit, and the Defendant argued with and interrupted the judge. She insisted she wanted a motions hearing. The court stated,

> If you insist you're going to represent yourself, then we'll [hear] your Motions, and when I rule on them you'll keep your mouth shut, and we'll go on. You're not going to sit here and argue with me. If you want to be a lawyer, you're going to have to act like a lawyer.

The court heard other matters then had the motions hearing, during which the Defendant continued to argue with and interrupt the judge. Eventually, the following exchange took place:

THE COURT:  Okay. Now when I talk lawyers stop talking.

MS. WHITE:          All right.

THE COURT:          And you want to play lawyer. So when I talk, you stop
                    talking. That's what they all have to do, and that's what
                    I had to do for twenty years when I was standing back
                    there. When the Judge talks, you stop.

Among the motions, she raised a motion to reduce her bail and argued that her bail was
excessive. The court stated that her bail was not excessive for a Class C felony and inquired
about her ties to the county. She said she lived within fifty miles of the courtroom, that she
was known in the community, and that she had "a vested interest in staying here for this
wonderful trial." The following then occurred:

THE COURT:          You own property here.

MS. WHITE:          . . . my . . .

THE COURT:          You told me that.

MS. WHITE:          . . . my man does.

THE COURT:          Your man does? Your man? Your – your man? Your
                    man. That doesn't sound like sovereignty to me – for
                    him. Sounds like involuntary servitude for him.

COURT CLERK:        Probably worse.

Later in the hearing, the trial judge inquired whether the Defendant was from California as
someone had stated. She asked whether he had "a problem with Californians," which he
denied.

At the September 2, 2010 hearing, the court appointed the public defender as advisory
counsel. The court continued to express concern for the Defendant's desire to proceed pro
se. After repeatedly interrupting the court, the Defendant stated she would like to confer
with the public defender, referring to him by an incorrect name. The court corrected her
pronunciation and misidentification.

The court conducted two additional hearings in September 2010, during which the
Defendant repeatedly interrupted the trial judge. The Defendant has not complained about
the trial court's actions or demeanor during these hearings.

-20-

During jury selection, the Defendant asked the trial court if there was a time limit on making a decision regarding peremptory challenges, and the court said that it needed to be done and that the jurors were waiting. The court briefly admonished the Defendant in front of the jury for returning late from a break. When the Defendant claimed to have been in a restroom, the court stated that an officer had reported seeing her across the street. At the sentencing hearing, the defense contended that the Defendant could not have shot just over the victims' heads given the slope of the driveway, to which the trial judge responded that he had been to the scene and was familiar with it.

The Defendant argues that these incidents demonstrate the trial court's prejudice against her by suggesting that it was "us" against the Defendant, that she was wasting their time, and that her credibility was questionable. She also argues that the court's decision to revoke her bond was punitive and demonstrates its prejudice against her. She contends that she was denied a fair trial.

The record reflects that the pro se Defendant repeatedly tried, and on some occasions exhausted, the patience of the trial court. She failed to demonstrate respect for the court and courtroom decorum when she repeatedly interrupted and argued with the trial judge, even after she was admonished. The judge did his best to maintain order, and many of the examples cited by the Defendant are examples of the judge's efforts after trying lesser methods of getting the Defendant's attention. Contrary to the Defendant's claim, the record reflects that the judge made extensive efforts to accommodate the Defendant's desire to proceed pro se. Likewise, contrary to the Defendant's claim, the record reflects that the judge reinstated the original bail amount of $20,000 after the Defendant failed to retain counsel with the $10,000 released for that purpose, despite the court having released the funds at her request. The judge's inquiry about the Defendant's ties to California were relevant in the context of the Defendant's request for bond reduction. His correcting the Defendant in the identification of and pronunciation of the public defender's name was in furtherance of his efforts to provide her with advisory counsel. The judge made extensive efforts to accommodate the Defendant within the bounds of established procedures.

Regarding the comments about "your man" and "involuntary servitude," we consider these comments in the context of the Defendant's statements during the proceedings about her lack of belief in the State's sovereignty and the legitimacy of its laws. The record reflects that the term "involuntary servitude" was significant to the Defendant's beliefs regarding the State and was mentioned in her pleadings. We cannot conclude that the trial judge ridiculed the Defendant. Even if we were to consider the judge's remark as intemperate, it, at most, reflects momentary frustration due to the Defendant's actions at that hearing and is not indicative of overall prejudice or a denial of due process.

-21-

Regarding the trial judge's admonishing the Defendant in the jury's presence, we acknowledge that the better course would have been to address the Defendant at the bench. We conclude, though, that the brief admonition at the beginning of a two-day trial does not demonstrate prejudice by the judge and that it had no effect on the verdict. The trial judge did not err in failing to recuse himself. The Defendant is not entitled to relief.

**III**

The Defendant contends that the grand jury foreman was not selected constitutionally because there was a systematic exclusion from the position based upon gender, race, and ethnicity. The State contends that the Defendant waived the issue by failing to raise it before the trial. We agree with the State.

Tennessee Code Annotated section 22-2-313 (2009) provides:

> In the absence of fraud, no irregularity with respect to this title or the procedure under this title shall affect the validity of the selection of any grand jury or the validity of any verdict rendered by a petit jury unless the irregularity has been objected to before the jury is sworn.

The Defendant argues in her reply brief that she attempted to object to the grand jury at the November 30, 2009 hearing, at which she requested a list of the names of the grand jurors. She said the names were not listed on the indictment. The court explained that only the foreman of the grand jury signed an indictment. She said, "[T]here wasn't actually a Grand Jury." She stated she wanted their names to determine if they had a conflict of interest, and the court denied the request. She asked, "[W]ould now be the time to object to the Grand Jury, Sir?" but did not explain further. The court said, "No. Now's not the time to object to a Grand Jury."

The Defendant raised various other motions and objections before the trial, including a motion demanding a jury of her peers, but not addressing any issue regarding the grand jury or its foreman. The record also reflects that she filed a motion to dismiss the indictment based upon various legal arguments regarding the "artificially created government of the State of Tennessee," the sufficiency of the indictment's factual allegations, conflict of state and federal laws, and violation of various constitutional rights. She did not move to dismiss the indictment based upon any issue related to the grand jury or its foreman. Another pretrial pleading filed after the indictment was returned stated demands for various things, including, "Demand for indictment by grand jury. Demand to suppress the writing."

The statute requires that the objection to the grand jury be made before the jury is sworn. We interpret the court's statement at the November 30, 2009 hearing that "now" was not the time to object to the grand jury to mean the court would not consider the issue that day. We note, as well, that the only concern the Defendant mentioned on that date was possible conflicts of interest, and she never raised an issue before the trial about prejudice or exclusion of individuals from grand jury service based upon race, ethnicity, or gender. She has waived the issue and is not entitled to relief.

## IV

The Defendant contends that the indictment was not valid because no grand jury foreman was appointed. As with the previous issue, the Defendant waived an objection to the validity of the selection of the grand jury by failing to object before the trial. *See* T.C.A. § 22-2-313. She is not entitled to relief.

## V

The Defendant contends that the trial court erred in using a jury selection process that was not in accord with the relevant statute. The State contends that the Defendant waived the issue by failing to object before the jury was sworn. We conclude that the issue was not waived but that the Defendant is not entitled to relief.

The record reflects that the Defendant filed various pretrial pleadings, including a September 13, 2010 pleading titled "Second Extensive Mandatory Judicial Notice." She demanded a trial by a jury of her peers who subscribed to her political beliefs, lived in Bulls Gap and not the City of Greeneville, lacked knowledge of previous media publications about the case, were organic farmers familiar with pesticides, were not state or municipal employees or related to them, did not work at a hospital, and believed in the Constitutional rights to bear arms and to life, liberty, and the pursuit of happiness.

At the hearing on the motion for a new trial, defense counsel argued that the Defendant attempted to make a motion at a bench conference before jury selection began but that she was not allowed to file her written motion. The court noted that local rules required pretrial motions to be filed at the beginning of the term. Defense counsel argued that the Defendant only received the list of the jury pool ten days before the trial. The record also reflects that at a motions hearing three days before the trial, the public defender was present as advisory counsel and asked the court if it had "picked the panels for Monday [the day of the trial]," and the court responded by identifying four panels by number.

The trial transcript begins with the announcement of the case and the swearing of the venire and does not reflect whether a bench conference took place beforehand. The bench conferences of the trial have not been transcribed nor have they been summarized in a statement of the evidence pursuant to Tennessee Rule of Appellate Procedure 24(c). Defense counsel offered as an exhibit a document he argued was the motion the Defendant was unsuccessful in filing. The pleading challenges the venire on several bases, including the failure to select the venire by random drawing. Although the better practice would have been to prepare a statement of the evidence as provided for in the Tennessee Rules of Appellate Procedure for situations in which no transcript is available, we will consider the issue.

Relative to compiling the venire, Tennessee Code Annotated section 40-18-104 provides, "The names of the jurors are written on separate scrolls, placed in a box or other receptacle, and drawn out by a child under ten (10) years of age, by the judge, or some person agreed upon by the district attorney general and the defendant." At the motion for a new trial hearing, the Defendant presented the testimony of the court clerk regarding the method for selecting the jury panels. She said they were seated on a panel based upon their time of arrival at court. She acknowledged there was no procedure for selection by random drawing. We conclude that the method of selection was contrary to the statute. We conclude, though, that the Defendant is not entitled to relief because there is no evidence of fraud in the procedure used. *See Rutherford v. State*, 409 S.W.2d 535 (Tenn. 1966) (holding that violation of statutory procedure in selection of jurors did not invalidate the verdict in the absence of fraud).

## VI

The Defendant contends that the trial court erred in denying her motion to suppress the rifle as evidence. The State argues that the trial court properly denied the motion to suppress because exigent circumstances permitted seizure of the rifle, and that alternatively, any error in admission of the rifle was harmless because the Defendant never denied having the gun and it was not a crucial piece of evidence. We conclude that no exigent circumstances existed to justify entry into the home but that the admission of the rifle was harmless beyond a reasonable doubt.

At the hearing on the motion to suppress, Sergeant Davis testified that when he arrived at the scene, the Defendant was in custody. He stated that he instructed Deputies Taylor and Graham to collect the rifle, and that he saw them enter the house with the Defendant's husband and return with it. He said one of the reasons he told the deputies to get the rifle was that it was not secured.

Deputy Taylor testified that he and Sergeant Davis told the Defendant's husband they needed to collect the rifle as evidence. He said the Defendant's husband stated the rifle was inside. He said they told the Defendant's husband they needed to follow him inside to get the weapon in order to protect the officers' safety. He said that he and Deputy Graham went inside with the Defendant's husband and that the Defendant's husband did not object. He said the Defendant's husband took a rifle from a bedroom closet and gave it to him.

Deputy Humphreys testified that the officers asked the Defendant's husband the location of the weapon, that he said it was inside, that they asked if he would mind retrieving it, that he said he would not mind, that they asked if he would mind if a couple of officers went with him for their safety, and that the Defendant's husband did not object. He said other deputies went inside with the Defendant's husband and that he took possession of the gun when they returned. He said that on the way to the police station, the Defendant stated that she had been shooting at a deer. He said she also made statements about illegal immigrants, her organic farm, and spraying pesticides. He said the only reason the other officers went into the house was to retrieve the rifle. He denied that they intimidated the Defendant's husband. He agreed that after he arrested the Defendant, he told the Defendant's husband he needed the Defendant's identification.

Deputy Graham testified that when they asked the Defendant's husband about the rifle, he said it was inside. He said that they asked if they could retrieve it and that the Defendant's husband went with them into the house and took them to the rifle in the bedroom. He said he did not see any danger from anyone when he arrived at the scene.

Robert White testified that he was very distressed when the officers forced their way into the house to arrest the Defendant and put her in the back of a patrol car. He said four deputies were around him and asked for the Defendant's identification. He said that he did not know the location of the Defendant's purse and that although he tried to go to the patrol car to ask the Defendant where it was, the officers would not let him. He did not recall the officers' asking for the rifle. He said he did not invite them inside the house. He said he went inside and was followed by two deputies who stood in the kitchen. He said he went into the bedroom and was followed by the deputies. He said that apparently, one of them saw the rifle and took it from the closet. He denied that he handed the gun to an officer. He said that based upon what he witnessed with the officers and his wife, he believed he would have trouble with the officers if he did not cooperate. He said he did not say anything when the officers followed him into the house because he was afraid he would be arrested.

After receiving the evidence, the trial court found that the officers pushed their way inside to arrest the Defendant. The court found that later, the Defendant's husband acquiesced in the officers' following him into the house and retrieving the rifle. The court

concluded that his acquiescence did not amount to waiver of the warrant requirement. The court found, though, that exigent circumstances existed for a warrantless search and seizure based upon the Defendant's husband's being upset at his wife's arrest and his going into the house to get the rifle. The court said the officers had the right to protect their safety by entering the home and retrieving the gun. The court denied the motion to suppress.

The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

A similar guarantee is provided in Article 1, Section 7 of the Tennessee Constitution:

> That the people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures; and that general warrants, whereby an officer may be commanded to search suspected places, without evidence of the fact committed, or to seize any person or persons not named, whose offences are not particularly described and supported by evidence, are dangerous to liberty.

The essence of these constitutional protections is "to 'safeguard the privacy and security of individuals against arbitrary invasions of government officials.'" *State v. Downey*, 945 S.W.2d 102, 106 (Tenn. 1997) (quoting *Camara v. Municipal Court*, 387 U.S. 523, 528 (1967)). Since an individual's expectation of privacy is nowhere higher than when in his or her own home, a "basic principle of Fourth Amendment law" is "that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980) (internal quotations omitted). Under the "fruit of the poisonous tree" doctrine, evidence that is obtained through exploitation of an unlawful search or seizure must be suppressed. *See Wong Sun v. United States*, 371 U.S. 471, 488 (1963).

The prohibition against warrantless searches and seizures is subject only to a few specifically established and well-defined exceptions. *See Katz v. United States*, 389 U.S. 347, 357 (1967); *State v. Tyler*, 598 S.W.2d 798, 801 (Tenn. Crim. App. 1980). The United States Supreme Court, holding that the constitution prohibits the warrantless entry into a suspect's home to make a felony arrest, has stated that "the Fourth Amendment has drawn

a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." *Payton*, 445 U.S. at 590. Exigent circumstances exist "(1) when the officers [are] in hot pursuit of a fleeing suspect; (2) when the suspect represent[s] an immediate threat to the arresting officers or the public; and (3) when immediate police action [is] necessary to prevent the destruction of vital evidence or thwart the escape of known criminals." *Jones v. Lewis*, 874 F.2d 1125, 1130 (6th Cir. 1989). In addition, "law enforcement officers may also make a warrantless entry in an emergency to protect human life." *State v. Robbie W. Fields*, No. E2004-00716-CCA-R3-CD, slip op. at 6 (Tenn. Crim. App. Jan. 7, 2005).

Another exception is a search conducted pursuant to a valid consent to search. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). "To pass constitutional muster, consent to search must be unequivocal, specific, intelligently given, and uncontaminated by duress or coercion." *State v. Brown*, 836 S.W.2d 530, 547 (Tenn. 1992). The validity of consent is determined by examining the facts. *State v. Jackson*, 889 S.W.2d 219, 221 (Tenn. Crim. App. 1993). The burden is on the State to prove that consent was freely and voluntarily given. *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968). "Consent to enter and search a home will not be lightly inferred, nor found by mere acquiescence to unlawful authority." *State v. Clark*, 844 S.W.2d 597, 599 (Tenn. 1992).

A trial court's factual findings on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996); *State v. Jones*, 802 S.W.2d 221, 223 (Tenn. Crim. App. 1990). Questions about the "credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *Odom*, 928 S.W.2d at 23. The prevailing party is entitled to the strongest legitimate view of the evidence and all reasonable inferences drawn from that evidence. *State v. Hicks*, 55 S.W.3d 515, 521 (Tenn. 2001). The application of the law to the facts as determined by the trial court is a question of law, which is reviewed de novo on appeal. *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997).

The trial court found that the State failed to prove that the Defendant's husband's mere acquiescence provided free and voluntary consent for the officers to enter the home and seize the rifle. The record supports the court's conclusion. The Defendant's husband was in a coercive situation involving four officers, some of whom had just entered his home to apprehend the Defendant when she tried to close the door. After the Defendant was arrested and placed in a patrol car, they asked for the Defendant's identification, followed the Defendant's husband into the house, and asked for the rifle. The Defendant's husband felt like he had to comply or face arrest himself.

Considering the question of exigent circumstances, the record reflects that the officers had already arrested the Defendant and placed her in a patrol car when they asked her husband for her identification, and eventually, for the rifle. Although the Defendant's husband testified that he was upset and afraid he would be arrested if he did not cooperate, there is no evidence he posed an immediate threat to the officers or that there was any other individual present who might pose a threat to the officers if the rifle were not secured immediately. There is no indication that the officers could not have detained the Defendant's husband outside until a warrant could be obtained or valid consent could be given. We conclude that exigent circumstances did not exist for warrantless entry into the home and seizure of the rifle. The evidence should have been suppressed.

The remaining question is whether the erroneous admission of the evidence entitles the Defendant to a new trial. At the trial, the State presented eyewitness testimony the Defendant shot a rifle at the victims. The Defendant told Officer Humphreys that she shot at a deer. She told Officer Wade she was defending herself against illegal immigrants. There was no evidence that anyone other than the Defendant fired a gun. The witnesses identified the Defendant's husband as the person who walked up to them and walked away before a woman appeared and shot at them. In her closing argument, the Defendant argued in part, "We were on our own property, minding our own business, and these seven men came on to our property late at night, and attacked us." The rifle as an exhibit was not significant to the State's case, and despite the trial court's error in not suppressing it, its admission as evidence was harmless beyond a reasonable doubt. The Defendant is not entitled to relief.

## VII

The Defendant contends that the assistant district attorney general committed prosecutorial misconduct by eliciting testimony regarding the Defendant's invoking her right to counsel. The State contends that the Defendant has waived the issue by failing to cite to the record and failing to identify or describe the alleged wrongful conduct. Although the Defendant filed a reply brief, she did not address the State's waiver argument or identify the conduct of concern by referring to the record or description. Without some identification of the facts of the alleged prosecutorial misconduct, we are unable to consider the issue. The Defendant is not entitled to relief.

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE